# United States Court of Appeals
## For the Eighth Circuit

———————————————————

No. 12-1831

———————————————————

United States of America

*Plaintiff - Appellee*

v.

Leo Villarreal

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the District of South Dakota - Rapid City

——————————

Submitted: October 18, 2012
Filed: February 22, 2013

——————————

Before LOKEN, BEAM, and SMITH, Circuit Judges.

——————————

SMITH, Circuit Judge.

Leo Villarreal was charged in a three-count indictment with aggravated sexual abuse, in violation of 18 U.S.C. §§ 2241(a)(1), 2246(2)(A), and 1153 ("Count I"); aggravated sexual abuse, in violation of 18 U.S.C. §§ 2241(a)(1), 2246(2)(D), and 1153 ("Count II"); and sexual abuse, in violation of 18 U.S.C. §§ 2242(2), 2246(2)(C), and 1153 ("Count III"). A jury found Villarreal not guilty on Count I and guilty on

Counts II and III. On appeal, Villarreal argues that the district court[1] erroneously denied his (1) motion to dismiss the indictment for violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*; (2) motion to dismiss Count II of the indictment for failure to state an offense; (3) motion for judgment of acquittal or, in the alternative, new trial, on Count III due to insufficient evidence; and (4) motion for judgment of acquittal on Count III based on a variance between Count III and the evidence. We affirm.

I. *Background*

A. *Offense*

On March 9, 2010, Villarreal attended a party that Travis Lone Hill hosted at his home in Manderson, South Dakota, which is located within the exterior boundaries of the Pine Ridge Indian Reservation ("Pine Ridge"). Travis shares the home with his mother, Lisa Lone Hill, and his sisters, Marissa Two Lance and L.L.H. On that date, Marissa was 21 years old and L.L.H. was 14 years old. They were both home during the party, but Lisa was not. Villarreal arrived to the party intoxicated, yet he continued to drink more as the evening progressed.

Around midnight, Marissa and L.L.H. went to a friend's house. Upon their return, they went to the bedroom that they shared and slept in the same bed. Marissa wore jeans and a shirt to bed, while L.L.H. wore a tank top with pajama pants. L.L.H. awoke to Villarreal touching her leg. According to L.L.H., he then touched her breasts and vagina, under her clothing. Villarreal penetrated L.L.H.'s vagina with his fingers. Marissa awoke when she heard L.L.H. say "owie," and she saw Villarreal with his head between L.L.H.'s legs. Marissa reacted to protect her sister by throwing her arm and leg over L.L.H., causing Villarreal to back away from L.L.H. Marissa did not force Villarreal out of the room because she feared him.

---

[1]The Honorable Jeffrey L. Viken, Chief Judge, United States District Court for the District of South Dakota.

Marissa went back to sleep but was awakened again by Villarreal. At trial, Marissa testified, in pertinent part:

Q.    At some point after that did you go back to sleep?

A.    Yes.

Q.    And did something awaken you?

A.    Yes.

Q.    What do you wake up to find?

A.    My pants and my underwear being pulled down.

Q.    Who was there?

A.    Leo [Villarreal].

Q.    What about his hands? Where were his hands?

A.    They were touching my vagina and rubbing his hand, his finger back and forth.

* * *

Q.    (BY [the government]) What else happened with his hand?

A.    He put his finger inside my vagina.

Q.    Was he doing this—was it one hand or both?

A.     One.

Q.    Were you fully awake?

A.    Yes.

-3-

Q.     Well, were you just coming out of sleep?

A.     Yes.

On cross-examination, Marissa testified, in relevant part, as follows:

Q.     So when you woke up the second time by somebody pulling your pants down, I assume because you had just been awake, you woke up pretty quickly. I mean, that caused you to wake up, that feeling of your pants being down, is that true?

A.     Yes.

Q.     And again, because he was still in the room, when you went to sleep the first time you could see with the black light; you knew right away it was Leo again; he hadn't left; he was still there, is that true?

A.     Yes.

Q.     And you described for us yesterday how at that point he rubbed—once your pants got down, he rubbed your vagina; then he put his fingers in you. How you can tell us about that is you were awake to see that and to feel that and to know that it was him doing that to you, weren't you?

A.     Yes.

On redirect examination, Marissa testified, in relevant part, as follows:

Q.     (BY [the government]) When you were in the bed earlier the first time during the night, there's a little confusion. Your pants were being pulled down or were pulled down and you testified yesterday that Leo's finger was in your vagina, is that right?

A.     Yes.

Q.     And so that's—I mean, are you testifying from your memory of what happened?

A.     Yes.

In the morning, Marissa woke her sister up for school. She then left the bedroom to tell Travis that Villarreal, who was still in their bedroom, was doing something to L.L.H. Unfortunately, Travis was passed out at the kitchen table.

When Marissa left the room, Villarreal approached L.L.H. and pulled down her pants while holding her arms with one hand. Villarreal used his other hand to take off his own pants and underwear, as well as her underwear. According to L.L.H., Villarreal put his penis in her vagina, causing her pain. When Marissa re-entered the room, she could see Villarreal having sex with L.L.H. Her entrance interrupted Villarreal, who removed himself from L.L.H., pulled his pants up, and left the bed. He did not, however, leave the room. L.L.H. immediately left the bedroom and went into the bathroom to shower. After L.L.H. showered, she and Marissa went to a friend's house. Thereafter, L.L.H. went to school.

When Marissa returned home, she went to her mother's bedroom. But she eventually went back to her own bedroom to get ready for the day, and Villarreal was still on the bed in her room. As she opened the curtain to her closet, Villarreal said, "Did you know if you tell, Patty and Frances[2] would be really mad at you[?]" Villarreal then pulled Marissa onto the bed. Marissa told Villarreal that she would not tell. Villarreal held Marissa's arms and said, "Remember what I said. If you tell, they are going to be mad." Continuing to hold Marissa's arms, Villarreal unbuttoned his jeans and then pulled his own pants down. Marissa struggled against Villarreal and called for Travis. Villarreal put his penis inside of Marissa as she struggled. She again

---

[2]Patty and Frances are Villarreal's sisters. Villarreal is Lisa Lone Hill's cousin.

called for her brother, and Villarreal stopped, stating, "I am f[**]king drunk" and moving backwards. Marissa went into the bathroom and waited for Villarreal to leave.

Marissa later disclosed to another sister what Villarreal had done to L.L.H., and law enforcement was contacted. Federal Bureau of Investigation (FBI) Special Agent Charles Blackburn was assigned to investigate the sexual-abuse allegations against Villarreal. On March 18, 2010, Agent Blackburn traveled to Pine Ridge to collect evidence from the residence and speak with the alleged victims. Marissa spoke to Agent Blackburn about Villarreal's sexual abuse of her and L.L.H., originally telling him only about Villarreal's initial touching of her. A week before trial, Marissa revealed to Agent Blackburn and one of the prosecutors the additional sexual abuse that Villarreal had committed when she had returned to her room to get ready for the day. She explained that she did not divulge this abuse initially "[b]ecause [she] thought just by saying he touched [her] was good enough" and "[b]ecause [she] was embarrassed" and "scared."

During his initial visit to Pine Ridge, Agent Blackburn collected a bed sheet that was on Marissa and L.L.H.'s bed at the time of the alleged assault. Sometime later, he received L.L.H.'s underwear from a tribal law enforcement officer. Agent Blackburn examined the bed sheet and underwear using an alternate light source. He observed several areas that showed fluorescence, indicating the possible presence of bodily fluids.

On June 16, 2010, Agent Blackburn obtained a search warrant to collect two saliva samples from Villarreal. He collected those samples from Villarreal on June 21, 2010, by means of buccal swabs.

Approximately a month later, the government filed the three-count indictment against Villarreal. After the district court denied his motion to dismiss the indictment for violation of the Speedy Trial Act, Villarreal proceeded to trial on June 21, 2011.

The jury found Villarreal guilty of Counts II and III. It found him not guilty of Count I.

Villarreal filed post-trial motions for judgment of acquittal or, in the alternative, new trial under Federal Rules of Criminal Procedure 29 and 33. He also renewed his motion made at trial to dismiss Count II of the of the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) for failure to state an offense. The district court denied Villarreal's motions.

## II. *Discussion*

On appeal, Villarreal argues that the district court erred in denying his (1) motion to dismiss the indictment for violation of the Speedy Trial Act; (2) motion to dismiss Count II of the indictment for failure to state an offense; (3) motion for judgment of acquittal or, in the alternative, new trial, on Count III based on insufficiency of the evidence; and (4) motion for judgment of acquittal based on a variance between Count III and the evidence.

### A. *Speedy Trial Act*

On August 17, 2010, the government filed the three-count indictment against Villarreal. He was arrested on August 23, 2010. On August 24, 2010, Villarreal made his initial appearance, was arraigned, had counsel appointed, and was detained pending trial. The district court set the trial for November 2, 2010.

On October 4, 2010, Agent Blackburn took five pieces of evidence—a bed sheet, underwear, a buccal swab from Marissa, a buccal swab from L.L.H., and a buccal swab from Villarreal—to the South Dakota Division of Criminal Investigation Forensic Laboratory (SDFL). Agent Blackburn instructed the SDFL staff to conduct DNA testing on the evidence. He also requested a comparative analysis of Marissa's and L.L.H.'s DNA and Villarreal's DNA if biological material was found. Agent Blackburn notified the SDFL staff of the November 2, 2010 trial date based on his

understanding that SDFL "will kind of adjust their schedule of examinations to try to put the ones that have trial dates coming up toward the top of the list." If aware of a pending court date or other deadline, SDFL would prioritize its testing.

Either on October 4, 2010, or the following day, then-Assistant United States Attorney Carolyn Olson called SDFL for an estimate of when it would complete testing. Olson informed Villarreal's counsel, Assistant Federal Public Defender Gary G. Colbath Jr., of her intention to file a motion to continue the trial. She asked Colbath for his position.

On October 5, 2010, Olson moved for a 60-day continuance of the trial pursuant to 18 U.S.C. § 3161(h)(7)(A) (ends of justice). In the motion, Olson requested that the court move the trial "to after January 1, 2011, due to additional time needed by the [SDFL] to complete its DNA analysis." Olson indicated that SDFL staff "informed government counsel that, due to its caseload, the DNA analysis in this case will not be complete until the second week of December 2010." She explained that SDFL needed to test L.L.H.'s underwear and the bed sheet for the presence of DNA and to conduct the comparative analysis. Olson indicated that the DNA results "could impact plea negotiations between the parties, as well as trial strategies for either party should the case go to trial." Therefore, she "request[ed] a 60-day continuance so that both parties can receive the DNA results, have time to analyze the results, secure additional testing if needed, and engage in meaningful plea negotiations." She advised the court that she "ha[d] discussed the status of the DNA testing with defense counsel, Gary Colbath Jr., and he indicate[d] that the defendant ha[d] no objection to a 60-day continuance so that the DNA testing can be completed."

On October 7, 2010, the district court granted the motion to continue the trial and set a new trial date of December 28, 2010, based on its finding "that the ends of justice served by continuing this trial outweigh the best interests of the public and the defendant in a speedy trial insofar as counsel has made known to the court that

additional time is needed so DNA testing can be completed." On October 12, 2010, Villarreal filed a waiver of speedy trial.

On November 29, 2010—approximately one month prior to the new trial date—Olson moved for a 90-day continuance of the trial pursuant to § 3161(h)(7)(A). As in the first continuance motion, Olson requested the continuance "due to additional time needed by the [SDFL] to complete its DNA analysis." Olson explained that although the SDFL had "the victim's panties, as well as a bed sheet, which has been analyzed for the presence of DNA," "additional time [was] needed for the lab's comparative analysis with the victim's DNA and samples taken by a search warrant via buccal swabs from the defendant." According to Olson, the SDFL "informed [her] that due to its caseload, the DNA analysis in this case will not be complete until February 15, 201[1]." As in the first continuance motion, Olson stated that the DNA results "could impact the plea negotiations between the parties, as well as trial strategies for either party should the case go to trial." She "request[ed] a 90-day continuance so that both parties can receive the DNA results, have time to analyze the results, secure additional testing, if needed, and engage in meaningful plea negotiations." Olson represented that she had "discussed the status of the DNA testing with defense counsel . . . , and he indicate[d] that the defendant has no objection to a 90-day continuance so that the DNA testing can be completed."

On December 1, 2010, Villarreal filed a waiver of speedy trial. Two days later, the district court granted the motion to continue the trial for the same reasons as the prior continuance and set a new trial date of March 22, 2011.

On January 28, 2011, Agent Blackburn received an email on his Blackberry device from SDFL notifying him that a report was available for him to view. SDFL faxed the report to Agent Blackburn that day. Serologist Jerome Remm, who prepared the report, stated that he detected the presence of semen on the bed sheet but did not detect the presence of semen on L.L.H.'s underwear. Remm did not detect amylase

activity consistent with saliva on L.L.H.'s underwear or the bed sheet. When Agent Blackburn received the report, he was aware that trial was set for March 22, 2011. Agent Blackburn informed Olson that he received the report on or about January 28, 2011.

After Olson viewed Remm's report, she informed Colbath of the results and her intention to disclose that report and the comparative-analysis report, once it was complete. Because of Agent Blackburn's initial request for a comparative analysis if biological material was found, State Criminalist Jenny Fosness of the SDFL conducted the comparative analysis without further instruction. Olson discussed with Colbath the fact "that the finding of semen really didn't have any real meaning until the DNA analysis was complete[.]"

During the first or second week of February 2011, Olson spoke with Fosness, inquiring when Fosness would complete the comparative analysis. Olson was concerned about the comparative analysis's completion date because she had previously represented to the court that SDFL would complete it by February 15, 2011, and because the plea deadline was March 8, 2011. Fosness gave Olson an estimate of four to six weeks to complete the testing. Based on Fosness's estimate, Olson knew that she would need to file a third continuance motion.

Olson spoke with Colbath, explaining that she needed 30 days from the disclosure of the report to the start of trial to review the report, discuss the results with Fosness, retain rebuttal experts, if necessary, and engage in meaningful plea negotiations. Colbath agreed that a 30-day window was appropriate.

On February 2, 2011, Fosness took custody of the evidence. On February 22, 2011, she began interpreting the lab results. She completed her work and "finalized" the report, which was dated February 28, 2011. "Finalizing" the report meant that Fosness had completed the testing and her interpretation of the lab results and

forwarded the report to two other staff members for a technical review and an administrative review. The report was not ready for viewing until an administrative secretary and an evidence custodian completed necessary administrative duties. This process could take a day or longer, depending on the staff members' workload. Once the administrative process was complete, the evidence custodian would notify the submitting agent via email that the report was available.

At the end of February 2011, Olson tried to contact Fosness to learn the status of the comparative-analysis report. Fosness was unavailable, so Olson spoke to Paulette Petersen, the SDFL evidence custodian. Petersen indicated that she had not viewed the report. Olson knew there was a "lag time" between the finalizing of the report and its viewing date.

On March 2, 2011, Olson moved for a third continuance pursuant to § 3161(h)(7)(A) because of the March 8, 2011 plea deadline. Olson did not receive Fosness's report or know of its existence before filing the motion. Olson requested a 30-day continuance "due to additional time needed by the [SDFL] to complete its DNA analysis." Olson explained that although the SDFL had tested the victim's panties, it was "still in the process of completing DNA analysis of the bed sheet submitted in this case. State Criminalist Jenny Fosness indicate[d] that the DNA testing and subsequent report should be complete by March 15, 2011, due to the current caseload at the state laboratory." Olson represented that she had spoken with Villarreal's counsel, "who agree[d] that a continuance of 30 days will allow the parties to review the DNA result, hire rebuttal experts if necessary and to enter into meaningful plea negotiations."

Villarreal did not file a waiver of speedy trial. Nevertheless, on March 3, 2011, the district court granted the 30-day continuance motion and set a new trial date of Tuesday, April 19, 2011, again based on its "find[ing] that the ends of justice served by continuing this trial outweigh the best interests of the public and the defendant in

a speedy trial insofar as counsel has made known to the court that additional time is needed so DNA testing can be completed."

On March 9, 2011, Petersen, the SDFL evidence custodian, emailed Agent Blackburn to inform him of the report's availability. Blackburn did not learn of the report for a week because it was sent to his desktop computer, which he did not monitor closely. Although the email should also have been sent to Agent Blackburn's Blackberry device, it was not.

On March 16, 2011, Agent Blackburn first learned of the report's availability upon visiting SDFL to deliver evidence in an unrelated case. He was surprised to learn of the report's availability. He printed the report from a SDFL computer; 30 minutes later, he called Olson and left a voice message to inform her that "the analysis had been done." Agent Blackburn delivered a hard copy of the report to the United States Attorney's Office on either March 17 or 18, 2011. Because Olson was out of the office, she did not receive the report until March 24, 2011. She immediately disclosed both Remm's and Fosness's reports to Colbath, Villarreal's counsel.

On April 11, 2011, Villarreal moved to dismiss the indictment for violation of the Speedy Trial Act, challenging the motions for continuances that the government filed on October 5, 2010; November 29, 2010; and March 2, 2011. Villarreal argued that the periods of delay resulting from the three continuances were not excludable under the Act. Villarreal asserted that a lack of diligent preparation resulted in the filing of the first two continuance motions and bad faith resulted in the filing of the third continuance motion. The district court denied the motion to dismiss, finding no lack of diligence or bad faith on the government's part. *United States v. Villarreal*, No. CR 10–50082–JLV, 2011 WL 2182423 (D.S.D. June 3, 2011) (unpublished).

On appeal, Villarreal again challenges all three continuance motions, arguing that the government was not diligent in obtaining the DNA analysis of the evidence

and was misleading in its third continuance motion. He argues that the district court erred in finding that the three continuances would best serve the ends of justice and are therefore excludable under 18 U.S.C. § 3161(h)(7)(A).

Under the Speedy Trial Act, the defendant's trial must commence "within 70 days after a defendant is charged or makes an initial appearance unless the running of the time is stopped for reasons set out in the statute." *United States v. Herbst*, 666 F.3d 504, 509 (8th Cir. 2012) (quotation and citation omitted). However, the Act excludes from the speedy-trial calculation

> [a]ny period of delay resulting from a continuance granted by any judge . . . at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A). But "[n]o continuance under [§ 3161(h)(7)(A)] shall be granted because of . . . lack of diligent preparation . . . on the part of the attorney for the Government." *Id*. § 3161(h)(7)(C).

After certain days, such as periods of delay resulting from continuances, "are excluded, if the total number of non-excludable days exceeds seventy, then the district court must dismiss the indictment upon the defendant's motion." *United States v.*

*Aldaco*, 477 F.3d 1008, 1016–17 (8th Cir. 2007). The defendant bears the burden of supporting his motion. *Id*. at 1017.[3]

"[W]e review the district court's factual findings [for purposes of the Speedy Trial Act] for clear error and its legal conclusions de novo." *Herbst*, 666 F.3d at 509. "A judge's finding that a continuance would best serve the ends of justice is a factual determination subject to review under the clearly erroneous standard." *United States v. Hale*, 685 F.3d 522, 534 (5th Cir. 2012) (quotation and citation omitted). Therefore, we must determine whether the district court clearly erred in concluding that the three continuances would best serve the ends of justice and are therefore excludable from the speedy-trial calculation under § 3161(h)(7)(A).[4]

---

[3]The defendant *does not* bear the burden of proof regarding "the exclusion of time under 18 U.S.C. § 3161(h)(3) concerning the unavailability of the defendant or an essential witness." *Id*. (citing 18 U.S.C. § 3162(a)(2)).

[4]The government has not argued that Villarreal's written waivers of speedy-trial rights executed on October 12, 2010, and December 1, 2010, preclude him from asserting violations of the Speedy Trial Act. The Supreme Court has held that "a defendant may not prospectively waive the application of the [Speedy Trial] Act." *Zedner v. United States*, 547 U.S. 489, 503 (2006). The Court explained that "§ 3161(h) has no provision excluding periods of delay during which a defendant waives the application of the Act, and it is apparent from the terms of the Act that this omission was a considered one." *Id*. It also "distinguished between prospective waivers (i.e., waivers made expressly by the defendant prior to trial that disclaim any rights under the Speedy Trial Act) and retrospective waivers (i.e., waivers made unintentionally by the defendant by failing to move to dismiss based on a speedy trial violation prior [to] trial)." *United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (citing *Zedner*, 547 U.S. at 502 ("[T]here is no reason to think that Congress wanted to treat prospective and retrospective waivers similarly. . . . The sort of retrospective waiver allowed by § 3162(a)(2) does not pose a comparable danger because the prosecution and the court cannot know until the trial actually starts or the guilty plea is actually entered whether the defendant will forgo moving to dismiss.")). Here, Villarreal expressly waived prior to trial any rights under the Speedy Trial Act; under *Zedner*, "a defendant may not prospectively waive the application of the Act."

-14-

### 1. *October 5, 2010 Continuance Motion*

Villarreal argues that the district court erred in finding that the government's October 5, 2010 request for a continuance would serve the ends of justice because, according to Villarreal, the government was not diligent in getting the evidence tested. Villarreal asserts that "the district court ignored the fact the prosecution was aware the court on August 24, 2010, had set trial for November 2." He asserts that he "was entitled to expect the prosecution would be diligent in trying to meet this trial date." He concedes, however, that the government "was under no obligation to have the evidence tested." Nevertheless, he asserts that his right to a speedy trial "should not . . . be defeated because of the prosecution's timing in deciding to submit for analysis evidence necessary for trial less than a month before trial necessitating a continuance request." He also argues that the district court "ignored [his] just reliance on the truth of the prosecution's representations in its October 5 motion when deciding to agree to it and file a waiver of speedy trial." Finally, he maintains that "the court erred in its factual and ultimate conclusion the case was in its early stages on October 5, 2010, and therefore, it was not a lack of diligence on the prosecution's part to fail to ask the lab to expedite testing."

Here, 42 days lapsed between the date of Villarreal's initial appearance through the date that the government filed its first continuance motion. We conclude, however, that the record supports the district court's finding that the delay in testing was not "unreasonable or indicative of a lack of diligence." *Villarreal*, 2011 WL 2182423, at *7. Notably, the court found that "[e]ven if Ms. Olson informed the court the evidence was submitted for testing on October 4, 2010, the court's decision would have remained the same." *Id*. at *8. The record shows that after Agent Blackburn turned the evidence over to the SDFL, Olson immediately called the SDFL to inquire when testing would be completed, and the SDFL staff estimated completion the week of December 2010—nearly nine weeks later. Villarreal has not shown how the district

---

547 U.S. at 503.

court clearly erred in concluding that the government was diligent when it (1) immediately inquired when the testing would be completed and (2) filed a motion for continuance the day after the evidence was turned into the SDFL and after the SDFL gave a completion date of approximately December 2010. Villarreal has cited no authority that a lapse of 42 days is per se unreasonable or indicative of a lack of diligence. Villarreal concedes that the government had no obligation to submit the evidence for DNA testing. And, he ignores that the test results could have potentially supplied evidence beneficial to his defense.

### 2. *November 29, 2010 Continuance Motion*

Villarreal also challenges the government's November 29, 2010 continuance motion. Villarreal argues that "[t]he district court's conclusion the prosecution did not lack diligence because it had no obligation to ask the lab to expedite testing . . . ignores the reality the prosecution, not the lab, is required to be cognizant of Villarreal's speedy trial right as well as deadlines imposed by the court."

Villarreal ignores the district court's stated reason for the "ends of justice" finding—that additional time was needed to complete DNA testing. Villarreal does not claim that this was a false reason. Instead, he argues that the government was not diligent enough in obtaining the test results. Again, Villarreal cites no authority setting forth how long is too long for the government to complete DNA testing. He also continues to ignore that the test results could have potentially supplied evidence beneficial to his defense.

### 3. *March 2, 2011 Continuance Motion*

Villarreal argues that the district court clearly erred in concluding that the government's March 2, 2011 request for a continuance would best serve the ends of justice and was therefore excludable from the speedy-trial calculation. First, he argues that the government's "representations were not based on current information from Fosness" because Olson "last talked to Fosness the first or second week of February"

and failed to check with Fosness "prior to filing the March 2 motion." But the record reflects that Olson attempted to contact Fosness again at the end of February and that Fosness was unavailable. For that reason, Olson spoke with Petersen, who indicated that she had not seen the report. Olson could reasonably rely on Petersen's representation. Furthermore, the report was not technically "available" until March 9, 2011, seven days after Olson filed the continuance motion.

Second, Villarreal argues that Olson's representation that the report would be completed by March 15 was "misleading" because Olson "left the impression with Villarreal and the court [that she] had talked with Fosness, contemporaneously to [the government's] motion when, in fact, [she] had not." But the record reflects that Fosness indicated to Olson that the report would by ready by March 15 when Olson spoke with Fosness during the first or second week of February. Due to Fosness's unavailability at the end of February and Petersen's subsequent representation that she had not yet seen the report as of the end of February, Olson could reasonably rely on Fosness's prior representation that the report would be completed around March 15, 2011.

Third, Villarreal argues that the district court "ignored evidence the prosecution had another case set for trial March 29, . . . a week after Villarreal's scheduled trial, had not yet begun preparations for Villarreal's trial, and the prosecutor assigned to Villarreal's case, Olson, would be leaving the United States Attorney's office after the March 29 trial." He also asserts that the court "ignored Villarreal's showing [that] his treatment was in line with the apparent pattern and practice of the prosecution to buy time by delaying submission of evidence for testing." Villarreal, however, ignores that the report was not actually ready for viewing until March 9, 2011, seven days after Olson filed the continuance motion.

## 4. *Conclusion*

We conclude that the district court did not clearly err in concluding that the three continuances would best serve the ends of justice. Villarreal filed his motion to dismiss based upon a Speedy Trial Act violation on April 11, 2011, before the scheduled trial date of April 19, 2011. Because the district court properly excluded the time resulting from the three continuances, the speedy-trial clock had not expired when Villarreal filed his motion to dismiss on April 11, 2011. As of that date, 42 non-excludable days had elapsed under the Speedy Trial Act. The Act automatically excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(D). Therefore, the period of time from April 11, 2011, to June 3, 2011, resulting from Villarreal's motion to dismiss is excludable. Because the speedy-trial clock had not resumed running since the government's first continuance motion, only 42 non-excludable days had elapsed as of June 3, 2011.

Villarreal's trial commenced on June 21, 2011—18 days after the court's order on the motion to dismiss. These 18 non-excludable days, combined with the 42 non-excludable days, results in a total of 60 days of non-excludable time that elapsed since Villarreal's initial appearance. Accordingly, no violation of the Speedy Trial Act occurred. *See Herbst*, 666 F.3d at 509.

## B. *Sufficiency of the Indictment*

Count II of the indictment alleged:

> On or about March 10, 2010, at Manderson, in Indian country, in the District of South Dakota, the defendant, Leo Villa[r]real, an Indian, *did knowingly engage and attempt to engage in a sexual act*, to wit, the intentional touching, not through the clothing, of the genitalia of [L.L.H.], a person who had not attained the age of 16 years, with the intent to abuse, humiliate, harass, degrade and arouse and gratify the

-18-

sexual desire of Leo Villa[r]real, by using force against [L.L.H.], all in violation of *18 U.S.C. §§ 2241(a)(1)*, 2246(2)(D) and 1153.

(Emphases added.)

In turn, § 2241(a)(1) provides:

(a) By force or threat.—Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly *causes another person* to engage in a sexual act—

(1) by using force against that other person . . .

or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

(Emphasis added.)

Thus, the indictment charged Villarreal with "knowingly engag[ing] and attempt[ing] to engage in a sexual act" instead of "knowingly *caus[ing] another person* to engage in a sexual act" or attempting to do so, as specifically provided in § 2241(a)(1). (Emphasis added.)

Villarreal argues that § 2241(a)(1) and Count II are not the same and that the district court "mistakenly equated them to hold the indictment sufficiently charged a section 2241(a)(1) offense." According to Villarreal, § 2241(a)(1)

contemplates the defendant acting in some manner to make another person engage in a sexual act. It does not require the defendant himself

-19-

engage in the sex act or even be present when it occurs. In fact, under the statute, whether the defendant actually engages in sex is irrelevant.

As an example, Villarreal states that a person might violate the statute by telling another person that he will kill that person's pet unless she has sex with his friend. And, he argues that a defendant could by force cause the victim to engage in a sexual act with a third party without personally participating in the sexual act. Villarreal asserts that Count II does not state a § 2241(a)(1) offense because it fails to contain any element of proof requiring the government to show that he caused some other person to engage in a sexual act.

In support of his argument, Villarreal compares the "knowingly caused another" language used in § 2241(a)(1) with the "knowingly engages" language of 18 U.S.C. § 2242(2). Section 2242(2) prohibits an individual from "knowingly . . . engag[ing] in a sexual act with another person if that other person is . . . incapable of appraising the nature of the conduct; or . . . physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act; or attempt[ing] to do so." According to Villarreal, "[b]y this differing language, Congress obviously meant two different things."

> Generally we review a challenge to the sufficiency of an indictment *de novo*, *See United States v. O'Hagan*, 139 F.3d 641, 651 (8th Cir. 1998), but Federal Rule of Criminal Procedure 12(b)(2) requires such challenges to be raised prior to trial, and a failure to do so constitutes a waiver. Fed. R. Crim. P. 12(f); *United States v. Davis*, 103 F.3d 660, 674 (8th Cir. 1996). However, the claim that the indictment fails to state an offense may be raised at any time. *United States v. Rosnow*, 9 F.3d 728, 729 (8th Cir. 1993). Therefore, although [Villarreal] did not raise this issue prior to trial, it is not precluded from our review on this appeal. Nonetheless, we apply a more deferential standard of review, because "[w]hen an indictment is challenged after jeopardy attaches, it is upheld 'unless it is so defective that by no reasonable construction can it be said to charge the offense.'" *United States v.*

*Pennington*, 168 F.3d 1060, 1064–65 (8th Cir. 1999) (citing *United States v. Just*, 74 F.3d 902, 904 (8th Cir. 1996)); *United States v. Davis*, 103 F.3d 660, 675 (8th Cir. 1996) ("an indictment that is challenged after jeopardy has attached will be liberally construed in favor of sufficiency").

*United States v. White*, 241 F.3d 1015, 1020–21 (8th Cir. 2001) (second alteration in original).

"An indictment need not use the specific words of the statute, so long as 'by fair implication' it alleges an offense recognized by law." *Pennington*, 168 F.3d at 1065 (quoting *United States v. Mallen*, 843 F.2d 1096, 1102 (8th Cir. 1988) ("It is not necessary that the indictment use the precise language used in the statute, as long as the indictment, by fair implication, alleges an offense recognized by the law.")).

> An indictment is fatally insufficient when an essential element "of substance" is omitted, rather than one "of form" only. To determine whether an essential element has been omitted, a court may not insist that a particular word or phrase appear in the indictment when the element is alleged "in a form" which substantially states the element.

*Mallen*, 843 F.2d at 1102. Although "a citation in the indictment to the applicable statute [is] not in itself sufficient to supply an element of a charged offense omitted by the grand jury," when such citation is "considered in combination with the other allegations in the indictment as a whole, [it may be] adequate under the circumstances to have charged the defendant with the offense for which he was convicted." *United States v. Diaz-Diaz*, 135 F.3d 572, 576 (8th Cir. 1998).

Although the indictment does not track the language of § 2241(a)(1) verbatim, we conclude that the indictment is not "so defective that by no reasonable construction can it be said to charge the offense for which [Villarreal] was convicted. *Id*. "First, . . . the indictment specifically referenced the appropriate statute, [§ 2241(a)(1)],

which contains the ["causes another person"] language that is missing from the charge." *Id*.

Second, the reference to § 2241(a)(1), when considered in combination with the other allegations in the indictment, adequately charged Villarreal with the § 2241(a)(1) offense. *See Just*, 74 F.3d at 904 ("Although citation to the charging statute does not necessarily cure the omission of an essential element of the offense, in this case there is sufficient information provided in the indictment to inform Just of the charges against him." (citation omitted)). Count II lists a specific date, the location, and the victim—L.L.H. And, although a defendant need not actually participate in a sexual act to violate § 2241(a)(1), knowingly engaging in the sexual act with the victim is one manner of violating the statute's prohibition against "knowingly caus[ing] another person to engage in a sexual act." *Cf. United States v. Starr*, 533 F.3d 985, 997 (8th Cir. 2008) ("The language difference between 'producing' and 'causing the production of' is not sufficiently material to create a variance in Starr's case.").

Finally, viewing the indictment in its totality, it does not charge Villarreal with a § 2242(2) offense, as opposed to a § 2241(a)(1) offense. Although Count II contains the phrase "knowingly engage and attempt to engage in a sexual act," it does not require that Villarreal have "knowingly . . . engage[d] in a sexual act with another person" who "is . . . incapable of appraising the nature of the conduct; or . . . physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act."[5]

---

[5]Because we hold that the indictment sufficiently charged a § 2241(a)(1) offense, we necessarily reject Villarreal's argument that because Count II "did not charge an offense under [§] 2241(a)(1)," the district court "constructively amended Count II [in the final jury instruction] by substituting the statutory language for the grand jury's indictment language, materially altering the charge brought against Villarreal and enabling the jury to convict him of an offense with which he had not

## C. *Sufficiency of the Evidence—Count III*

Villarreal argues that the district court erroneously denied his motion for judgment of acquittal or, in the alternative, new trial, on Count III based on insufficiency of the evidence. According to Villarreal, although the district court correctly found that he "could not be found guilty of the principal offense of sexual abuse of an incapacitated person because the victim was awake at the time digital penetration occurred and knew it was Villarreal, the court incorrectly sustained Villarreal's conviction on the alternative charged theory of attempt." Villarreal maintains that "partially pulling down the victim's pants was [not] a substantial step toward committing the offense."

> Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "In reviewing the sufficiency of the evidence to support a guilty verdict, we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." *United States v. Augustine*, 663 F.3d 367, 373 (8th Cir. 2011) (quotations and citations omitted). We "review[ ] de novo [the] district court's denial of a motion for judgment of acquittal"; however, "we review a challenge to the sufficiency of the evidence deferentially and affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotations, alterations, and citations omitted).

*United States v. Vega*, 676 F.3d 708, 721 (8th Cir. 2012) (alterations in original). We review the district court's denial of Villarreal's motion for a new trial for an abuse of discretion. *Id.* at 722.

Count III charged Villarreal with sexual abuse, in violation of 18 U.S.C. § 2242(2). As explained *supra*,

been charged."

[§] 2242(2) make[s] it unlawful for an Indian in Indian country knowingly to engage, or attempt to engage, in a "sexual act" with another person who is "incapable of appraising the nature of the conduct," or "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act."

*United States v. Papakee*, 573 F.3d 569, 573 (8th Cir. 2009) (quoting 18 U.S.C. § 2242(2)).

Therefore, to convict Villarreal of sexual abuse, the government was required to prove the following: (1) on or about March 10, 2010, Villarreal knowingly engaged in a or attempted to engage in a sexual act with Marissa; (2) at the time of the offense, Marissa was incapable of appraising the nature of the conduct or was physically incapable of declining participation in or communicating unwillingness to engage in the sexual act; (3) Villarreal is an Indian person; and (4) the offense took place in Indian country.

"[T]he term 'sexual act' [includes] . . . the penetration, however slight, of the . . . genital opening of another by a . . . finger . . . with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(C). A jury may

convict [a] defendant [under § 2242(2)] under any one of four theories: (1) that the defendant engaged in sexual abuse; (2) that the defendant attempted to engage in sexual abuse; (3) that the defendant aided and abetted the commission of sexual abuse; or (4) that the defendant aided and abetted the commission of attempted sexual abuse. Because the jury returned a general verdict of guilty in the case of [the] defendant, we do not know which theory or theories the jury found that the government proved beyond a reasonable doubt. We will therefore uphold the jury's verdict[] if the evidence is sufficient to support the defendant['s] conviction[] under any one of the alternative theories. *Turner v. United States*, 396 U.S. 398, 420, 90 S. Ct. 642, 24 L. Ed. 2d 610 (1970). The

evidence is sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

*Papakee*, 573 F.3d at 574.

"[O]ur cases have held that performing a sexual act upon a person who is sleeping meets the requirements of § 2242(2)(B)." *United States v. Lowry*, 595 F.3d 863, 866 (8th Cir. 2010) (citing *United States v. Wilcox*, 487 F.3d 1163, 1169 (8th Cir. 2007) ("A reasonable jury may conclude that a person who is asleep when a sexual act begins is physically unable to decline participation in that act."); *United States v. Barrett*, 937 F.2d 1346, 1348 (8th Cir. 1991) (describing evidence sufficient to show a state of incapacity within the meaning of § 2242(2)(B))).

In the present case, the district court concluded that although insufficient evidence existed that Villarreal engaged in sexual abuse, sufficient evidence existed that Villarreal *attempted* to engage in sexual abuse. According to the district court, Marissa's "testimony [showed that] she clearly was awake when the sexual act, that is, the penetration of her genital opening by Mr. Villarreal's finger, occurred." *Villarreal*, 2012 WL 683356, at *9. Nor was she "intoxicated so as to affect her ability to ascertain the nature of the sexual act or to decline participation in, or communicate unwillingness to engage in, the sexual act." *Id*. Therefore, the district court concluded that Villarreal did not engage in sexual abuse under § 2242(2)(B). But the court concluded that sufficient evidence supported an attempt theory. First, the court found that

> [a] reasonable jury viewing the evidence could find beyond a reasonable doubt the pulling down of [Marissa's] pants and underwear by Mr. Villarreal while she was asleep followed by the swift completion of the sexual act demonstrated Mr. Villarreal's intent to sexually abuse

-25-

[Marissa] while she was asleep, that is, while she was incapable of appraising the nature of the conduct or was physically incapable of declining participation in or communicating unwillingness to engage in the sexual act.

*Id*. at \*12. Second, the court concluded that Villarreal's "act of pulling down [Marissa's] pants and underwear . . . while she was asleep was a substantial step toward the commission of sexual abuse as charged in Count III." *Id.*

We agree with the district court that sufficient evidence supports the theory that Villarreal attempted to engage in sexual abuse. "An attempt requires (1) an intent to engage in criminal conduct, and (2) conduct constituting a substantial step toward the commission of the substantive offense which strongly corroborates the actor's criminal intent." *United States v. Robertson*, 606 F.3d 943, 953 (8th Cir. 2010) (quotations and citations omitted). "A substantial step goes beyond 'mere preparation' but may be less than the 'last act necessary' before commission of the substantive crime." *United States v. DeMarce*, 564 F.3d 989, 998 (8th Cir. 2009) (quoting *United States v. Mims*, 812 F.2d 1068, 1077 (8th Cir. 1987)). "The chief purpose of the substantial step requirement is to corroborate the actor's specific intent to commit the crime." *United States v. Plenty Arrows*, 946 F.2d 62, 66 (8th Cir. 1991) (quotations and citation omitted). As a result, "the act must be of such an unequivocal nature that it is calculated to bring the desired result to fruition." *Id.* (quotations and citation omitted). "[T]he determination whether a defendant's conduct amounts to a 'substantial step' is necessarily dependent on the particular factual circumstances in the case at hand." *United States v. Mazzella*, 768 F.2d 235, 240 (8th Cir. 1985).

Villarreal does not challenge the intent element of attempted sexual abuse; instead, he argues that "[t]he question . . . is whether Villarreal's act of pulling down [Marissa's] pants was a substantial step toward committing the charged conduct. Only evidence of Villarreal's actions before [Marissa] woke up, before the actual act of penetration occurred, is relevant to this question."

Here, Marissa testified that she woke up to Villarreal "pulling [her] pants down." This awakened Marissa "pretty quickly." When asked where Villarreal's hands were when she awoke, Marissa testified, "They were touching my vagina and rubbing his hand, his finger back and forth." When asked "[w]hat else happened with his hand," Marissa testified that Villarreal "put his finger inside [her] vagina." As the district court noted, "[a] reasonable inference from [Marissa's] testimony is this sequence of acts progressed quickly." *Villarreal*, 2012 WL 683356, at *12. Marissa's testimony establishes that Villarreal took a substantial step toward committing sexual abuse. Prior to Marissa waking up, there was nothing more for Villarreal to do but insert his finger into Marissa's vagina. *Robertson*, 606 F.3d at 954 ("In fact, it is difficult to understand what further act the defendant could have performed toward the goal of forced penetration, short of actual completion of the substantive offense." (quotation, alterations, and citation omitted)). In essence, Marissa "thwarted [Villarreal's] efforts to penetrate her vagina with his finger" while she was still asleep by waking up. *United States v. Plenty Chief*, 561 F.3d 846, 854 (8th Cir. 2009) ("T.Q. testified that, in 2005, Plenty Chief once again entered her bedroom and began rubbing her thighs; she thwarted his efforts to penetrate her vagina with his finger, as he had done in 2004, by rolling away from him several times during the incident."). Based on the circumstances of the present case, we conclude that sufficient evidence supports Villarreal's conviction under § 2242(2)(B) for attempted sexual abuse.

## D. *Variance*

At the close of the government's case, Villarreal moved for judgment of acquittal. Villarreal contended that Marissa's testimony constructively amended or caused a variance of the indictment to his prejudice. Specifically, he cited her statement that Villarreal, subsequent to the conduct alleged in Count III, forcibly raped her. The district court denied the motion because the government did not seek to convert Count III into a forcible rape charge. Villarreal's counsel responded by arguing that the jury could use the additional evidence to convict Villarreal of the

charged crime by proof of a different sexual act not presented to the grand jury. The district court rejected this argument, stating:

> The only allegation as to Marissa Two Lance which is going to the jury is Count III which will be defined and each essential element of Count III will be defined. The jury is not going to have in front of it any opportunity to convict Mr. Villarreal on any forcible rape or any matter connected with that.

> Let me just check my pretrial rulings here. There was no motion by the defense to prevent Marissa Two Lance from testifying about the whole course of events, that is, not only the conduct that was set out in Count III, but when she went on, as you learned last week, when she went on and decided that she's now going to tell the prosecution and its agents about an additional sexual act on the part of Mr. Villarreal, there was no motion to exclude that testimony. That is, it came in as res gestae and you cross-examined about it repeatedly and pointed out what I took to be your effort to demonstrate that she had made contrary statements on prior occasions and failed to disclose or make a statement about that additional sexual act at a different time. You did move to exclude it and, of course, I kept out any reference to pregnancy or medical records that would have been connected with this sex act that was first revealed and discovered to you last week, but there wasn't any motion to keep her from testifying about that. And so that was fully developed in front of the jury both by the prosecution and defense as res gestae evidence. So I don't see the constructive amendment argument.

> The jury is only going to be told they can reach a verdict on Count III and not any other charge with regard to Marissa Two Lance.

On appeal, Villarreal argues that the indictment failed to alert him about Marissa's allegation of forcible rape. According to Villarreal, Count III only charged him with digitally penetrating Marissa when she was "incapable of appraising the nature of the conduct and physically incapable of declining participation in, and communicating an unwillingness to engage in the sexual act." The indictment did not

charge him with sexual assault by force or sexual contact. But Villarreal asserts that Marissa testified not only to the facts claimed in Count III but also to a subsequent, uncharged act of forcible sexual assault that she claimed that he committed when he came back into the bedroom. Villarreal contends that Marissa only revealed this act a few days prior to trial and that the alleged act occurred in the same room a short time after the conduct alleged in Count III.

> A variance arises when the evidence presented proves facts that are "materially different from those alleged in the indictment." *United States v. Begnaud*, 783 F.2d 144, 147 n.4 (8th Cir. 1986). "[A] variance in the evidence affects the defendant's right to adequate notice" under the Sixth Amendment. [*United States v.*] *Stuckey*, 220 F.3d [976,] 981 [(8th Cir. 2000)]. When a variance occurs, "[t]he charging document does not change, only the evidence against which the defendant expected to defend" varies. *Id.* "Whether a variance exists, and, if so, whether that variance prejudiced [the defendant] are questions of law that we review de novo." *Id.* at 979. Where the indictment "fully and fairly" apprises the defendant of the allegations against which he must defend, prejudice is absent and any variance is harmless error. *See Begnaud*, 783 F.2d at 148; *see also Stuckey*, 220 F.3d at 982 ("holding that any variance between the indictment date and proof at trial did not result in material prejudice where time was not a material element of the criminal offense").

*United States v. Buchanan*, 574 F.3d 554, 564–65 (8th Cir. 2009) (first, fifth, and sixth alterations in original).

Villarreal cites a Ninth Circuit case in support of his argument that a variance occurred between the indictment and the proof at trial, *United States v. Tsinhnahijinnie*, 112 F.3d 988 (9th Cir. 1997). In *Tsinhnahijinnie*, "[t]he Ninth Circuit found a variance between the indictment and evidence at trial because the indictment charged the defendant with committing crimes 'between June 1992 and July 1992,' but the evidence at trial was only sufficient to enable a jury to find crimes occurred in

1994, not 1992." *United States v. Wright*, 540 F.3d 833, 841 (8th Cir. 2008) (quoting *Tsinhnahijinnie*, 112 F.3d at 989–90).

The present case is factually distinguishable from *Tsinhijinnie*. Here, the date, location, victim, and manner of committing the offense charged in Count III were presented to the jury, precisely as they were listed in the indictment. Villarreal complains that the testimony about the subsequent sexual assault resulted in a variance between the indictment and the evidence. This would have been true had the government not presented evidence of the first attempt. As both the district court and government recognize, the evidence of the second act was presented in addition to, rather than in place of, the evidence of the sexual act alleged in Count III. Moreover, we note that (1) Villarreal never objected to this testimony at trial or moved to exclude it prior to trial, (2) Villarreal has not raised any evidentiary objection to admission of the evidence on appeal, and (3) Villarreal's counsel cross-examined Marissa about the second sexual encounter.

Therefore, we hold that no variance occurred between the indictment and the proof at trial as to Count III.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____