# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 11-1135/11-1172/11-1373

_____

United States of America,  *
                           *
    Appellee,              *
                           *   Appeals from the United States
    v.                     *   District Court for the
                           *   Western District of Missouri.
Mateo Ruiz-Zarate; Elias Isaac  *
Guerrero-Ramirez; Ramon    *
Benavente-Zubia, aka Zubia Ramon  *
Benavente, aka Lazaro Rueda-Rueda,  *
aka Jesus Reyes Benaventes, aka  *
Jesus Jesus Reiz-Gambos,   *
                           *
    Appellants.            *

_____

Submitted: January 12, 2012
Filed: April 30, 2012

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Mateo Ruiz-Zarate, Elias Guerrero-Ramirez, and Ramon Benavente-Zubia of conspiring to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846, and aiding and abetting in the possession with intent to distribute 100 kilograms or more of marijuana, in violation

of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. The jury also convicted Benavente-Zubia of illegal re-entry after deportation, in violation of 8 U.S.C. § 1326. The district court[1] sentenced Benavente-Zubia to concurrent 151-month terms of imprisonment on each of the drug counts to run concurrently with a 24-month sentence for illegal re-entry, followed by five years' supervised release. The district court sentenced Guerrero-Ramirez and Ruiz-Zarate to 97 months' imprisonment on each drug count to run concurrently, followed by four years' supervised release. All three defendants appeal their sentences, and Ruiz-Zarate and Guerrero-Ramirez also appeal their convictions.

## I. *Background*

On January 6, 2010, Deputy Tracey Trammel with the Shawnee County, Kansas Sheriff's Department (SCSD) stopped a Ford pickup truck with Arizona tags that was traveling eastbound on I-70 for a suspected traffic violation. As Trammel approached the truck, he noticed that a black auxiliary fuel tank in the truck bed had been altered, and he suspected that the driver, Epimenio Ybarra Morales, was using the tank to transport contraband. Trammel asked for and received consent to search the truck and tank. Morales told Trammel that he thought that marijuana was in the tank. After officers escorted Morales and the truck to the SCSD annex in Topeka, Kansas, officers removed the tank and discovered a large quantity of marijuana.

Morales agreed to cooperate with officers and attempt a delivery of the truck and tank to a Wendy's restaurant located on I-435 in Kansas City, Missouri. Morales drove the truck to the Wendy's parking lot, left the keys inside, and went in the restaurant. A little while later, Benavente-Zubia and an unidentified passenger pulled into the Wendy's parking lot. The passenger got out of the vehicle, got into Morales's truck, and drove away. After that, Benavente-Zubia went into the Wendy's restaurant

---

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

and spoke with Morales. Officers arrested Benavente-Zubia outside of the restaurant approximately 15 minutes later. He possessed $1,000 in cash and three cell phones, one of which was used to contact Morales to set up the transfer. Morales stated that he had seen Benavente-Zubia at a similar transfer at least one time before.

Officers followed Morales's truck to a detached garage next to a single-family residence. As the officers approached the garage, they could hear people talking inside and the sound of tools being dropped. One officer knocked on the garage door and saw Guerrero-Ramirez exit the garage and walk through the yard. The officer knocked again on a gate attached to a privacy fence next to the garage and announced "police." Guerrero-Ramirez stopped, and the officer saw several people exit the garage and run toward the house. Officers then entered the yard through the gate and apprehended Guerrero-Ramirez near the garage. Officers apprehended Ruiz-Zarate two blocks away and returned him to the scene.

Officers questioned Ruiz-Zarate and Guerrero-Ramirez after their arrests. Both men stated that they lived at the residence. Ruiz-Zarate said that he fled from the residence because "he believed a home invasion was in progress." Guerrero-Ramirez stated that a dog located at the house belonged to him. Guerrero-Ramirez testified at trial that he lived at a different address, and he explained that he initially gave police the wrong address because he did not want the police going to his actual home where his wife and daughter lived for fear that they would be deported. Ruiz-Zarate gave officers consent to search the residence. Officers recovered from the garage a fuel pump, a two-ton hoist with straps, Sawzalls, drills and bits, a blow torch, parts of a gas fuel tank that matched the removed portions of the auxiliary tank in Morales's truck, and a number of other tools. In the unoccupied basement of the home, officers found three large plastic containers with marijuana residue, boxes of plastic Ziploc bags, and two scales. Also in the basement, on a ledge behind a wall, officers found a rusted but functioning .22-caliber Colt revolver. Officers did not find any ammunition with the revolver, in the house, or on any of the defendants.

On February 9, 2010, a grand jury indicted Guerrero-Ramirez, Ruiz-Zarate, and Benavente-Zubia for conspiring to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846, and aiding and abetting in the possession with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. The indictment also charged Benavente-Zubia with illegal re-entry after deportation, in violation of 8 U.S.C. § 1326.

During the course of a four-day jury trial, the government put on evidence that a man named "Ramon" owned the house where police arrested Guerrero-Ramirez and Ruiz-Zarate. Also, the evidence showed that Benavente-Zubia possessed three cell phones, one of which was "Ramon's" phone. The government also presented evidence, over Benavente-Zubia's objection, that Benavente-Zubia had been removed from the United States four different times and had returned without authorization prior to the events leading to his arrest. Department of Homeland Security Immigration and Customs Enforcement Agent Daniel Byrd testified that Benavente-Zubia had gone by the aliases "Manuel Gutierrez-Figerroa," "Lozaro Rueda-Rueda," "Jesus Reyes Benaventes," and "Jesus Jesus Reiz-Gambos."

At the close of the government's case, all three defendants moved for judgments of acquittal, arguing that there was no evidence of an agreement or understanding between the parties and that their mere presence at the scene was insufficient to establish a conspiracy. The district court denied the motions. The jury found the defendants guilty of all charges. The district court sentenced Benavente-Zubia to concurrent 151-month terms of imprisonment on each of the drug counts to run concurrently with a 24-month sentence for illegal re-entry, followed by five years' supervised release. The district court sentenced Guerrero-Ramirez and Ruiz-Zarate to 97 months' imprisonment on each drug count to run concurrently, followed by four years' supervised release.

-4-

## II. *Discussion*

On appeal, Ruiz-Zarate contends that an illegal traffic stop of Morales's truck invalidated Ruiz-Zarate's subsequent arrest. Guerrero-Ramirez and Ruiz-Zarate argue that the district court erred by denying their motions for a judgment of acquittal based on insufficiency of the evidence. All defendants argue that the district court erred by enhancing their sentences for possession of the .22-caliber Colt revolver that was found in the basement of the residence.

### A. *Legality of the Traffic Stop*

Ruiz-Zarate alleges for the first time on appeal that his arrest was unlawful because it stemmed from a traffic stop that Deputy Trammel conducted without a reasonable basis.[2] The government argues in response that Ruiz-Zarate lacks standing to challenge the traffic stop because he had no reasonable expectation of privacy in Morales's truck.

Ruiz does not argue that he had a reasonable expectation of privacy in Morales's truck at the time of the stop. Rather, he contends that he has "standing" to raise a Fourth Amendment challenge because he suffered an injury-in-fact "that is fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (quotation, citation, and alteration omitted). Our court has previously rejected Ruiz's argument, concluding that this "concept of 'standing' has not had any place in Fourth Amendment jurisprudence . . . since the Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth

---

[2]Because this issue is raised for the first time on appeal, it is subject at most to plain error review. *See United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008) (noting that "we have not yet decided whether the failure to raise a suppression matter in a timely pretrial motion precludes plain error review" (quotation, alteration, and citation omitted)).

Amendment law." *United States v. Green*, 275 F.3d 694, 698 n.3 (8th Cir. 2001) (quotation, alteration, and citation omitted). "Fourth Amendment rights are personal and may not be vicariously asserted." *United States v. Randolph*, 628 F.3d 1022, 1026 (8th Cir. 2011) (quotation and citation omitted). Thus, to challenge a search or seizure under the Fourth Amendment, "the defendant must show that (1) he has a reasonable expectation of privacy in the areas searched or the items seized, and (2) society is prepared to accept the expectation of privacy as objectively reasonable." *United States v. Stults*, 575 F.3d 834, 842 (8th Cir. 2009) (quotation and citation omitted). Here, Ruiz-Zarate had no reasonable expectation of privacy in Morales's vehicle, which he neither owned nor was near at the time of the traffic stop. Consequently, Ruiz-Zarate cannot raise a Fourth Amendment claim.

## B. *Sufficiency of the Evidence*

Guerrero-Ramirez and Ruiz-Zarate argue that there was insufficient evidence to sustain their convictions for conspiracy to distribute marijuana and for aiding and abetting in the possession with intent to distribute marijuana. We review the sufficiency of the evidence de novo, reversing only if no reasonable jury could have found the defendants guilty. *United States v. Clay*, 618 F.3d 946, 950 (8th Cir. 2010) (per curiam).

### 1. *Conspiracy*

To support a conviction for conspiracy to distribute marijuana, the government had to prove that (1) a conspiracy to distribute marijuana existed; (2) the defendants knew of the conspiracy; and (3) the defendants intentionally became a part of the conspiracy. *United States v. Diaz-Pellegaud*, 666 F.3d 492, 499 (8th Cir. 2012). "Because the nature of conspiracy entails secrecy, the agreement and members' participation in the conspiracy must often be established by way of inference from the surrounding circumstances." *United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007) (quotation, alterations, and citation omitted).

-6-

> Even when there is no direct proof of a conspiracy, the jury is free to consider all the evidence—direct and indirect—presented of the defendant's statements and actions[,] and they may draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented in the evidence.

*United States v. Turner*, 583 F.3d 1062, 1067 (8th Cir. 2009) (quotations and citation omitted). "But a defendant's mere presence, coupled with the knowledge that someone else who is present intends to sell drugs, is insufficient to establish membership in a conspiracy." *United States v. Rolon-Ramos*, 502 F.3d 750, 754 (8th Cir. 2007) (quotation and citation omitted). "If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction." *United States v. Burks*, 934 F.2d 148, 151 (8th Cir. 1991).

Guerrero-Ramirez and Ruiz-Zarate do not dispute that a conspiracy to distribute more than 100 kilograms of marijuana existed. Instead, they assert ignorance of and lack of participation in the conspiracy. They argue that their mere presence at the house where the criminal activity occurred is insufficient to establish their role in the conspiracy. "Mere presence" is insufficient to establish participation in a conspiracy. *Rolon-Ramos*, 502 F.3d at 754. However, the government offered evidence from which a reasonable jury could infer that Ruiz-Zarate and Guerrero-Ramirez intentionally participated in the conspiracy to distribute marijuana. Detective Anthony Garcia, who interviewed Ruiz-Zarate and Guerrero-Ramirez soon after their arrest, testified that (1) the two defendants told him that they lived at the residence; (2) Guerrero-Ramirez's dog was at the residence when officers arrived; (3) Guerrero-Ramirez said he was called to the garage during a snow storm "to help out with something"; (4) Ruiz-Zarate fled the property when officers knocked and announced on the privacy fence gate; and (5) Guerrero-Ramirez tried to run from police. When officers arrived, it appeared that someone had been unloading marijuana from the truck in the garage. The officers found scales, Ziploc bags, and plastic containers with marijuana residue in the basement of the residence, along with empty beer bottles.

Guerrero-Ramirez testified at trial that he and Ruiz-Zarate were friends who had spent the day drinking together.

From this evidence, a reasonable jury could have concluded beyond a reasonable doubt that Ruiz-Zarate and Guerrero-Ramirez participated in a conspiracy to distribute marijuana. *See United States v. Roberson*, 439 F.3d 934, 942 (8th Cir. 2006) (finding that defendants' conspiracy convictions were supported by sufficient evidence where officers discovered the house in question devoid of furniture yet containing three electronic scales in the kitchen, the residence was leased to one of the defendants, both defendants had access to the house, one defendant was arrested after what appeared to be a drug transaction, both defendants were apprehended with large amounts of cash, and crack cocaine was located in the house in close proximity to items belonging to the defendants). Therefore, we will not disturb the verdicts and will affirm the defendants' conspiracy convictions.

## 2. *Aiding and Abetting*

To sustain an aiding and abetting conviction, the government must prove that "(1) the defendant associated himself with the unlawful venture; (2) the defendant participated in it as something he wished to bring about; and (3) the defendant sought by his actions to make it succeed." *United States v. Turner*, 583 F.3d 1062, 1067 (8th Cir. 2009) (quotation, alterations, and citation omitted). In *Turner*, we held that the defendant's

> presence at the residence, the numerous methamphetamine-related products present, and the large quantity of methamphetamine discovered, combined with the overwhelming odor of methamphetamine in the residence, provide[d] sufficient evidence for a reasonable jury to find that [the defendant] was not just an innocent bystander, yet was associated with, actively participated in, and sought the success of the manufacture of methamphetamine . . . .

*Id.* Likewise, a reasonable jury could have inferred from the evidence that Ruiz-Zarate and Guerrero-Ramirez were in the garage when marijuana was being removed from the auxiliary tank of the truck; both defendants lived in or had access to the residence next to the garage where a number of marijuana distribution-related paraphernalia were found; and both defendants ran or attempted to run from the property when police arrived. This was "sufficient evidence for a reasonable jury to find that [Ruiz and Guerrero] w[ere] not just . . . innocent bystander[s]" but were "associated with, actively participated in, and sought the success of [possession with intent to distribute marijuana]." *Id.*

Ruiz-Zarate argues on appeal that the district court erred by failing to give the jury his proffered "mere presence" instruction, which would have advised the jury that Ruiz-Zarate's "mere presence" at the residence was insufficient to establish aiding and abetting in the possession with intent to distribute marijuana.[3] A mere presence instruction is not required in circumstances where its use would have served merely to duplicate instructions "outlining the elements of the offense, the definition of possession, and the burden of proof." *United States v. Jara*, 474 F.3d 1018, 1022 (8th Cir. 2007) (citing *United States v. Serrano-Lopez*, 366 F.3d 628, 637 (8th Cir. 2004)). Such was the case here, and the district court did not err in declining to give the instruction.

C. *Sentencing Enhancement for Possession of a Firearm*

All three defendants argue on appeal that the district court erred by imposing a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of the .22-caliber Colt revolver that officers found in the basement of the residence.[4] The

---

[3]The district court gave a "mere presence" instruction on the conspiracy charge.

[4]Guerrero-Ramirez argues in his brief that the district court failed to apply the correct standard for a § 2K2.1(b)(6) enhancement; the district court did not apply that enhancement, however, and it is not relevant to his sentence.

defendants deny knowledge of the gun and argue that the enhancement cannot be applied for possession of a gun that they did not know existed.

For § 2D1.1(b)(1) to apply, the government must prove by a preponderance of the evidence that "(1) the gun was possessed and (2) it was not clearly improbable that the weapon was connected to the drug offense." *United States v. Anderson*, 618 F.3d 873, 880 (8th Cir. 2010).

"To prove that the firearm was 'possessed,' the government need not prove ownership of either the weapon or the premises on which it is found for a § 2D1.1(b)(1) enhancement to apply." *Id.* at 879. Actual or constructive possession of either the firearm or the premises on which it is found is sufficient. *Id.* at 880 (finding constructive possession of a gun that was locked in a safe in a storage unit when defendant admitted placing the gun there and had keys to the unit and safe). "We have found constructive possession where police found weapons after a defendant's arrest in a storage facility rented in the name of someone other than the defendant." *Id.* at 881 (citing *United States v. Montanye*, 962 F.2d 1332, 1347–48 (8th Cir. 1992)).

"The government need not show that the defendant used or even touched a weapon to prove a connection between the weapon and the offense." *United States v. Hernandez*, 440 F. App'x 522, 523 (8th Cir. 2011) (unpublished per curiam) (affirming district court's finding that it was not clearly improbable that an unloaded gun hidden in attic above defendant's garage and wrapped in bandana and electrical tape was connected with defendant's drug offense when defendant stated that he kept it in the attic so police would not find it); *see also United States v. Dunning*, No. 97-1802, 1997 WL 415241, at *1 (8th Cir. Jul. 25, 1997) (unpublished per curiam) (finding no clear error in the district court's determination that it was not clearly improbable the revolver, which was found in a closet with the drugs and cash, was

connected with the offense even though defendant professed a lack of knowledge as to the presence of the revolver).

In this case, each of the defendants constructively possessed the .22-caliber revolver. Ruiz-Zarate and Guerrero-Ramirez were at the residence where officers found the gun; even though the gun was unloaded and hidden behind a ledge in the basement, Ruiz-Zarate and Guerrero-Ramirez could access the basement. In fact, Guerrero-Ramirez testified that they had been drinking all day, and officers found a number of beer bottles in the basement. Although Benavente-Zubia was not at the residence when officers found the gun, a neighbor testified at trial that someone named "Ramon" owned the residence. *See United States v. Williams*, 10 F.3d 590, 595 (8th Cir. 1993) (stating that constructive possession includes dominion over the premises). Furthermore, "[a] defendant convicted of conspiracy is properly held accountable for all reasonably foreseeable acts . . . of any co-conspirator taken in furtherance of that conspiracy." *United States v. Brown*, 148 F.3d 1003, 1008 (8th Cir. 1998). The government presented evidence at trial that guns are commonly used in drug conspiracies to protect the drug that the defendants are distributing. Because the defendants were involved in a drug conspiracy, Benavente-Zubia could have reasonably foreseen that his co-conspirators might be armed. *See United States v. Turpin*, 920 F.2d 1377, 1386 (8th Cir. 1990) ("[T]he single gun may justify an enhancement of the sentences of both [co-conspirators], since possession of a gun by either would suffice to justify an upward adjustment of the other's offense level if it was reasonably foreseeable that one of them would possess a gun in furtherance of the jointly undertaken criminal activity.").

Nor did the district court clearly err by determining that it was not clearly improbable that the gun was connected to the drug offense. The gun was located in the basement of the residence, along with three plastic containers with marijuana residue, boxes of Ziploc bags, and two scales. *Cf. United States v. San-Miguel*, 634 F.3d 471, 474 (8th Cir. 2011) (affirming the application of the enhancement when a

revolver was found in a locked safe with cocaine). "The fact that the revolver was unloaded when found by the agents does not weigh heavily against the district court's conclusion." *Id.* Nor does the fact that the revolver was on a ledge behind a wall covered in dust make it clearly improbable that the revolver was connected to the drug offense. *Cf. Hernandez*, 440 F. App'x at 523. The gun was operable, and we cannot say that it was clearly improbable that it was connected to the drug offense.

Ruiz-Zarate also contends that the district court failed to adequately explain its findings regarding the § 2D1.1(b)(1) enhancement. Ruiz-Zarate failed to raise that issue below, so we review only for plain error. *United States v. Phelps*, 536 F.3d 862, 865 (8th Cir. 2008). There is no evidence that the district court plainly erred in its explanation of the § 2D1.1(b)(1) enhancement. "In explaining the sentence the district court need only set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *United States v. Gonzalez*, 573 F.3d 600, 607 (8th Cir. 2009) (quotation and citation omitted). Regarding the § 2D1.1(b)(1) enhancement, the district court stated:

> The basis for that ruling, Paragraph 28 of the presentence says, "During a search of the residence the officers located Money Gram receipts in the closet of the second bedroom. In addition, three large plastic containers with marijuana residue, multiple boxes of Ziploc bags, two digital scales, a Colt, Single-Action Frontier Scout, .22-caliber revolver, and a paper trash bag were found in the basement of the residence.
>
> Now, everybody understands that there were no bullets found, the gun wasn't loaded, but I'm ruling that it should be counted because it was there. . . . If there had been intruders and you or one of the other defendants or one of the occupants of the house wanted to try to scare or ward off the intruder, they could have pulled that unloaded gun and pointed it at them. So it was usable by whatever strange means, whatever strange purpose. It could have been used to protect the marijuana operation, so I'm going to allow the two points to stand. I

-12-

might further observe— well, . . . when a gun is pointed at someone, they don't have the luxury of deciding whether it's loaded or unloaded, and probably you could anticipate if you pointed it at a police officer, you might get shot. So it was usable in the drug trade, although marginal, but it still could have been exhibited in a threatening manner. I'm going to allow the two points to stand.

The district court had a reasoned basis for its decision and thus did not plainly err in imposing the § 2D1.1(b)(1) enhancement.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____