# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-2307

_____

United States of America

*Plaintiff - Appellee*

v.

Trey Michael Boykin

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Sioux City

_____

Submitted: April 17, 2015
Filed: July 24, 2015

_____

Before BYE and SMITH, Circuit Judges, and SCHILTZ,[1] District Judge.

_____

SMITH, Circuit Judge.

Trey Michael Boykin was convicted of one count of kidnapping, in violation of 18 U.S.C. § 1201, and one count of conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846. On appeal, Boykin argues that the

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

superseding indictment was missing an essential element on the kidnapping charge, rendering the indictment fatally flawed and entitling him to a judgment of acquittal. As to the conspiracy conviction, Boykin asserts that there was insufficient evidence of a conspiracy to distribute marijuana and that the district court erred in failing to give his requested buyer-seller instruction. Having reviewed the record, we affirm Boykin's kidnapping conviction but reverse his conspiracy conviction for insufficient evidence. We remand for further proceedings consistent with this opinion.

I. *Background*

"We recount the evidence in the light most favorable to the jury's verdict." *United States v. Battle*, 774 F.3d 504, 508 (8th Cir. 2014) (citation omitted). R.W., a football player and student at Briar Cliff University ("Briar Cliff") in Sioux City, Iowa, occasionally smoked marijuana. In the summer of 2012, R.W. learned of Boykin after receiving his phone number from another individual from whom R.W. was purchasing marijuana. The individual informed R.W. that Boykin would deliver the marijuana to R.W. on campus because R.W. did not have a vehicle at the time.

R.W. first purchased marijuana from Boykin after he texted Boykin and asked if he had any marijuana. After Boykin texted a response back to R.W., Boykin drove to the Briar Cliff campus where he met R.W. in the parking lot. R.W. got inside of Boykin's vehicle and paid him $15 for one gram of marijuana, which R.W. smoked. According to R.W., when he smoked marijuana, he typically smoked "one or two" grams at a time and smoked "occasionally" or on "weekends."

During Briar Cliff's Thanksgiving or Christmas break in 2012, Boykin called R.W. to tell R.W. that Boykin had marijuana. R.W. took little notice of the phone call because he was in St. Louis, Missouri, for the break. R.W. told Boykin that R.W. would call Boykin when R.W. got back into town.

A few days prior to February 25, 2013, Boykin "bumped into" Gerry Patterson in Sioux City. Boykin and Patterson knew of each other through acquaintances. Boykin asked Patterson if Patterson had any marijuana. Patterson replied that he did not have any at the time. The two men then exchanged phone numbers in the event that Patterson obtained some marijuana later.

On February 24, 2013, after football practice, R.W. texted people—including Boykin—looking for marijuana. R.W. wanted to get "[a]n ounce" of marijuana. According to R.W., who was a "gram user" of marijuana, an "[o]unce is a lot of marijuana." He was going to pay $170 for the ounce of marijuana. R.W. was going to "[s]hare [the marijuana] with friends on campus, share it with other teammates." R.W. testified that he "would smoke marijuana with other teammates and on the reassurance that they would either pay me back or smoke back with me." When asked whether he was "going to sell it," R.W. replied, "I was going to share it I would say, yes." When asked whether "[p]eople were going to give [R.W.] money" for the marijuana, R.W. replied, "Yes." R.W. *did not* testify that he disclosed to Boykin that R.W. was planning on sharing the marijuana with others or receiving money for the marijuana that he wanted to purchase from Boykin.

Boykin texted Patterson and asked him if he had a "[h]alf ounce" of marijuana. Boykin then asked for a "full ounce" of marijuana. Patterson informed Boykin that he did not have any marijuana. Boykin and Patterson then started discussing a plan to rob R.W., whom Patterson did not know. They planned to rob R.W. at a bar but changed their plan after Boykin discovered police officers there. Instead, they decided to meet at the intersection of West Third and George in Sioux City.

Boykin texted R.W. and told him that he had the marijuana. R.W. told Boykin the amount of money that R.W. had to spend on the marijuana. Through the exchange of text messages, R.W. agreed to buy one ounce of marijuana from Boykin for $170. R.W. indicated to Boykin that he had more money and could buy more marijuana if

the deal worked out. Boykin first suggested taking R.W. to an off-campus location to obtain the marijuana, but R.W. responded that he did not want to leave campus because it was late. Boykin replied that he would meet R.W. on campus.

Patterson met Boykin at West Third and George and got into Boykin's vehicle. Patterson was carrying a handgun in his waistband, which he placed on his lap once he got into the car. Boykin then drove to Briar Cliff so that he and Patterson could rob R.W. When Patterson expressed his concern that R.W. would call the police, Boykin replied that R.W. would not call the police "[b]ecause it was a drug deal." Once Boykin and Patterson arrived on the Briar Cliff campus, Boykin parked and texted R.W. to let R.W. know that Boykin had arrived.

Early in the morning of February 25, 2013, R.W. saw Boykin on campus and entered Boykin's car at his direction. Upon entering the back seat of the car behind the driver's seat, R.W. noticed a stranger in front seat. R.W. entered the car thinking that he was going to purchase marijuana from Boykin.

According to R.W., Boykin then drove the car in reverse even though R.W. had told Boykin that he did not want to leave campus. As Boykin drove the car in reverse, the front-seat passenger—which was Patterson—pulled a gun on R.W. R.W. testified that the first comments that Boykin and Patterson made to him were that they had just talked with the Briar Cliff security guards, as those security guards had approached them while they were parked on campus and asked them to park the vehicle within the lines or be ticketed. Patterson held the gun to R.W. and giggled, "basically saying that he had just talked to [R.W.'s] security guards." Boykin also giggled. R.W. did not exit the vehicle because Patterson was holding him at gunpoint. R.W. was scared and did not know where they were going. Patterson told R.W. that he had to "give up everything that [he] had." In response, R.W. "started emptying [his] pockets and

-4-

giving up everything that [he] had." R.W. had an iPhone, a wallet, a "gar card,"[2] his dorm room key, and $310 in cash. Patterson took the $310 and everything else but the iPhone and dorm key.

After they traveled a short distance from campus, Patterson told Boykin to stop the car and release R.W. Once Boykin stopped the car, Patterson pointed the gun at R.W. and told R.W. not to "try anything stupid" or he would "get shot." Boykin opened the back car door—because there was a child safety lock on that door—and let R.W. out. R.W. exited the car and started walking. As soon as R.W. saw Boykin's vehicle drive away, he called Briar Cliff security and reported that he had just been robbed at gunpoint. R.W. spoke very quickly and was very excited, which made him difficult to understand. After calling security, R.W. walked back to campus. He then called security again because Patterson had taken his gar card. A security guard met R.W. at the entrance of Noonan Hall and let him in. According to the security guard, R.W. "was very nervous, and he was very shaky, and he wanted to call his mom" because he had just been robbed.

After releasing R.W., Boykin drove to a gas station where Patterson gave Boykin $155 of the $310 taken from R.W. They divided the money evenly because the robbery was both of their ideas and they had both participated. Boykin then drove Patterson to a convenience store where they made purchases. Boykin then drove Patterson to another location where Patterson bought marijuana from "a home girl." Then, Boykin drove to the intersection of Eighth and Court for Patterson to "pay a marijuana debt." Patterson then asked Boykin to take him on another errand. While on that errand, an officer stopped Boykin and Patterson. Officers seized a handgun from Boykin's car and discovered R.W.'s gar card in the backseat. At the time of their arrest, Boykin had $145, and Patterson had $40 and a .22 caliber round in his pocket.

---

[2]A "gar card" is a card that Briar Cliff security issues to every Briar Cliff student, and the students use it to gain access to their dorm buildings.

A grand jury returned a six-count superseding indictment against Boykin and Patterson. Count 1 charged Boykin with conspiring to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) and 846. Count 2 charged Boykin with willfully and unlawfully seizing, confining, inveigling, decoying, kidnapping, abducting, and carrying away and holding R.W. by a means, facility, and instrumentality of interstate commerce, in violation of 18 U.S.C. § 1201. Count 3 charged Boykin with possessing and brandishing and aiding and abetting the possession and brandishing of a firearm in furtherance of the kidnapping, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A). Count 6 charged Boykin with knowingly possessing or aiding and abetting the possession of a firearm while being an unlawful user of a controlled substance, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2).

A jury trial commenced as to Boykin on Counts 1, 2, 3 and 6 of the superseding indictment. At the close of the government's evidence and at the close of all evidence, Boykin moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied his motion as to Count 1, struck the aiding and abetting language from Count 6, and reserved ruling as to Counts 2 and 3. The jury returned guilty verdicts as to Counts 1 and 2 and not guilty verdicts as to Counts 3 and 6.

Thereafter, Boykin filed a motion for judgment of acquittal or in the alternative a new trial requesting that the court grant a judgment of acquittal or new trial on Counts 1 and 2. As to Count 2, Boykin argued that he was entitled to a judgment of acquittal because the superseding indictment failed to allege all the necessary elements constituting the offense of kidnapping; specifically, it failed to include the language "for ransom or reward or otherwise." The court rejected this argument, concluding that "an indictment sufficiently charges the crime of kidnapping without any reference to the 'for ransom or reward or otherwise' language." (Citing *Hayes v. United States*, 296 F.2d 657, 666 (8th Cir. 1961).) The court also found "unavailing"

Boykin's allegation that the verdicts were contrary to the weight of the evidence and that Counts 1 and 2 were unsupported by substantial evidence.

## II. *Discussion*

On appeal, Boykin argues that the superseding indictment was missing an essential element on the kidnapping charge, rendering the indictment fatally flawed and entitling him to a judgment of acquittal. As to the conspiracy conviction, Boykin asserts that there was insufficient evidence of a conspiracy to distribute marijuana and that the district court erred by failing to give his requested buyer-seller instruction.

### A. *Sufficiency of the Indictment—Kidnapping*

Boykin argues that the district court erred in denying his motion for judgment of acquittal on the kidnapping charge because the indictment failed to contain the element of kidnapping requiring that the purpose of holding the victim was "for ransom, reward or otherwise." Boykin contends that "for ransom, reward or otherwise" was an essential element of the offense and that the indictment's failure to include such language violated his Fifth Amendment right to be tried on charges found by the grand jury.

We generally review de novo a challenge to the sufficiency of an indictment, "but Federal Rule of Criminal Procedure 12(b)(2) requires such challenges to be raised prior to trial, and a failure to do so constitutes a waiver." *United States v. Villarreal*, 707 F.3d 942, 957 (8th Cir. 2013) (quotation and citation omitted). Nevertheless, a defendant may raise at any time a claim that the indictment fails to state an offense. *Id*. (citation omitted). Here, Boykin admittedly did not raise his sufficiency challenge to the indictment prior to trial; therefore, "we apply a more deferential standard of review, because [w]hen an indictment is challenged after jeopardy attaches, it is upheld unless it is so defective that by no reasonable construction can it be said to charge the offense." *Id*. (alteration in original) (quotations and citations omitted).

An indictment need not use the specific words of the statute as "long as by fair implication it alleges an offense recognized by law." *Id*. (quotations and citations omitted). Only when an essential element "of substance" rather than "of form" is omitted is an indictment fatally insufficient. *Id*. (quotation and citation omitted). "To determine whether an essential element has been omitted, a court may not insist that a particular word or phrase appear in the indictment when the element is alleged in a form which substantially states the element." *Id*. (quotations and citation omitted). An indictment's citation to the applicable statute "'[is] not in itself sufficient to supply an element of a charged offense omitted by the grand jury'"; however, "when such a citation is 'considered in combination with the other allegations in the indictment as a whole, [it may be] adequate under the circumstances to have charged the defendant with the offense for which he was convicted.'" *Id*. at 957–58 (alteration in original) (quoting *United States v. Diaz-Diaz*, 135 F.3d 572, 576 (8th Cir. 1998)).

Boykin was charged with violating 18 U.S.C. § 1201(a)(1), which provides:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds *for ransom or reward or otherwise* any person, except in the case of a minor by the parent thereof, when—

> (1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense . . .

***

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

(Emphasis added.)

Here, Count 2 of the superseding indictment omitted "for ransom or reward or otherwise" as provided in § 1201(a)(1), stating:

> On or about February 25, 2013, in the Northern District of Iowa, defendants, GERRY ALAN PATTERSON and TREY MICHAEL BOYKIN, *did willfully and unlawfully, seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold*, R.W., and did use a means, facility, and instrumentality of interstate commerce (*i.e.*, telephones (including cell phones), multimedia messaging service (MMS), Short Message Service (SMS), iMessage, and an automobile) in furtherance of the commission of the offense.
>
> This was in violation of Title 18, United States Code, Section 1201.

(Emphasis added).

The question is whether the superseding indictment's omission of "for ransom or reward or otherwise" rendered it fatally insufficient as to Count 2.

We addressed this precise question in *Hayes v. United States*, 296 F.2d 657 (8th Cir. 1961), when reviewing a prior version of § 1201 that contained the "for ransom or reward or otherwise" language.[3] The indictment had charged the defendant

_____

[3]In *Hayes*, the version of § 1201 under review provided:

"Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held *for ransom or reward or otherwise*, except, in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnaped person has not been liberated

-9-

with knowingly transporting via automobile in interstate commerce "a person who had been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, carried away and by defendants held" but omitted "for ransom or reward or otherwise." *Id*. at 658; *see also id*. at 665 ("The indictment charged the interstate transportation by [the defendant] of persons he had kidnaped, in violation of 18 U.S.C. § 1201," but "[i]t did not charge that he had held them for any specific reason.").

On appeal, the defendant argued "that the indictment was fatally defective because there can be no violation of [§ 1201] unless the kidnaped individual is 'held for ransom or reward or otherwise.'" *Id*. at 665. Thus, the defendant "asserted that an indictment charging a violation of the Act must allege that the kidnaped person was held for some reason which comes within the meaning of 'ransom or reward or otherwise.'" *Id*. at 665–66. We found the indictment sufficient, relying on the Fifth Circuit's reasoning in *Clinton v. United States*, 260 F.2d 824 (5th Cir. 1958); in that case, the Fifth Circuit

> considered the sufficiency of an indictment charging a violation of the Federal Kidnaping Act, similar to the indictment in [*Hayes*], and had this to say (p. 825):
>
> > "Appellant complains that, although he was charged with unlawfully kidnapping and holding the victim, he was not charged with holding him 'for ransom or reward.' The statute does not make this an ingredient of the crime. It requires only that the person charged with transportation be shown to have 'unlawfully * * * kidnaped * * * or carried

---

> unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed."

*Id*. at 658 n.1 (emphasis added).

-10-

away and held for ransom or reward or otherwise' the victim. An allegation that appellant unlawfully and knowingly transported in interstate commerce the victim who had theretofore been unlawfully kidnapped and carried away by the said defendants and held is entirely adequate to withstand this motion. *It is difficult to see how the addition of the words 'for ransom or reward or otherwise' would have added anything to the indictment because obviously 'otherwise' comprehends any purpose at all*. If appellant desired to know more of the purpose the government intended to prove for his unlawful holding, he could have made a proper motion before trial to that end. His failure to do so waived his right to raise the point after conviction. *Knight v. Hudgpeth*, 10 Cir., 112 F.2d 137; *Knight v. United States*, 8 Cir., 137 F.2d 940."

*Id*. at 666 (emphasis added) (quoting *Clinton*, 260 F.2d at 825).

We also noted that the Supreme Court had previously "laid no stress on the statutory words 'held for ransom or reward or otherwise'" in setting forth the essential elements of § 1201. *Id*. at 667 (citing *Smith v. United States*, 360 U.S. 1, 9 (1959)). Furthermore, the Supreme Court had stated that "'[c]onvictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused.'" *Id*. (quoting *Smith*, 360 U.S. at 9). Likewise, this court had previously observed that an indictment's sufficiency

"should be judged by practical, and not by technical, considerations. It is nothing but the formal charge upon which an accused is brought to trial. An indictment which fairly informs the accused of the charge which he is required to meet and which is sufficiently specific to avoid the danger of his again being prosecuted for the same offense should be held good."

*Id*. (quoting *Hewitt v. United States*, 110 F.2d 1, 6 (8th Cir. 1940)).

In light of the foregoing, we held that the defendant

> was sufficiently informed by the indictment . . . of the charges he was required to meet; that the defect or imperfection of which complaint is made was minor and formal; and that the indictment was sufficiently specific to avoid any possibility of his being prosecuted a second time for the same offenses. There cannot be the slightest doubt that [the defendant] knew exactly with what offenses he was charged.

*Id*.

Consistent with *Hayes*, "[t]he Supreme Court has interpreted the word 'otherwise' as encompassing any purpose at all." *United States v. Noble*, Criminal Action No. 05-369, Civil Action No. 09-594, 2010 WL 653539, at *3 (E.D. Pa. Feb. 23, 2010 (citing *Gooch v. United States*, 297 U.S. 124, 127–28 (1936); *United States v. Healy*, 376 U.S. 75, 81–83 (1964)). "Because of this expansive construction, the kidnapping statute can be violated regardless of the defenda[n]t's motivation, and thus the 'purpose' language does not form an essential element [of] kidnapping under 18 U.S.C. § 1201." *Id*. (rejecting defendant's argument that "his grand jury indictment was defective so as to deny him, *inter alia*, "his Fifth Amendment right to be charged by grand jury indictment") (citing *Gawne v. United States*, 409 F.3d 1399, 1403 (9th Cir. 1969); *United States v. Martell*, 355 F.2d 764, 766 (4th Cir. 1964); *Hayes*, 296 F.2d at 665–67; *Clinton*, 260 F.2d at 825).

Post-*Hayes*, other circuits have agreed with this court that an indictment for kidnapping under § 1201 is sufficient even though the words "for ransom or reward or otherwise" do not appear. *See, e.g.*, *United States v. Webster*, 162 F.3d 308, 328–29 (5th Cir. 1998) ("If 'otherwise' can include any purpose, adding it to the indictment—irrespective of whether it specifies the 'otherwise' benefit—adds nothing. This view consists with that of our sister circuits."); *United States v. Adams*, 83 F.3d

-12-

1371, 1373–75 (11th Cir. 1996) (following *Clinton* and holding an indictment sufficient that alleged only that victim was "held"); *United States v. Atchison*, 524 F.2d 367, 370–71 (7th Cir. 1975) ("[I]t now appears to be well settled that purpose is not an element of the offense of kidnaping and need not be charged or proved to support a conviction under the kidnaping statute, a defect in the indictment's allegation of purpose is collateral in nature."); *United States v. Lutz*, 420 F.2d 414, 416 (3th Cir. 1970) (holding that indictment could be regarded as charging in effect that kidnapping was for purpose of raping victim and was therefore within federal kidnapping statute despite contention that indictment failed to charge that victim was "held for ransom or reward or otherwise"); *Gawne*, 409 F.2d at 1403–04 (holding (1) kidnapper's motivation is not an element of offense under Federal Kidnapping Act which covers interstate transportation of the kidnapped persons held for ransom or reward or otherwise; (2) under Federal Kidnapping Act the involuntariness of seizure and detention is very essence of crime, and the true elements of offense are unlawful seizure and holding followed by interstate transportation; and (3) because purpose of defendants in illegally seizing and holding victim was not an element of offense under charge of violating Federal Kidnapping Act, allegation of indictment regarding the purpose of defendants in kidnapping and transporting victim was surplusage and need not have been proved); *Martell*, 335 F.2d at 766 ("Nor would the inclusion of the words 'held for ransom or reward or otherwise' have added anything to the sufficiency of the indictment. While it did not use the word 'held,' it charged that Martell seized and confined the victim and 'did fail to release' him. The Supreme Court has recently declared that the statute is violated regardless of the ultimate purpose of the kidnapper. This being so, use of the statutory language, 'ransom or reward or otherwise,' was not necessary." (internal citations omitted)).[4]

---

[4]Both the current and prior versions of § 1201 have in common the language "for ransom or reward or otherwise," and our sister circuits have consistently held, regardless of the particular version of § 1201 under review, that the omission of such language does not render the indictment insufficient.

"It is a cardinal rule in [this] circuit that one panel is bound by the decision of a prior panel." *Owsley v. Luebbers*, 281 F.3d 687, 690 (8th Cir. 2002) (per curiam) (citation omitted). Seeing no discernable difference between the present case and *Hayes*, we are compelled to follow our prior holding that an indictment charging kidnapping under § 1201 is sufficient, even though it does not charge that the person kidnapped was held "for ransom or reward or otherwise."

B. *Sufficiency of the Evidence—Conspiracy to Distribute Marijuana*

Boykin next argues that insufficient evidence exists to support his marijuana-conspiracy conviction because the government presented evidence of only one transaction between Boykin and R.W. for one gram of marijuana and one other contact between Boykin and R.W. eighth months later where no actual sale occurred. According to Boykin, this evidence showed only two distinct buyer-seller type transactions, not a conspiracy to distribute marijuana.

"We review the sufficiency of the evidence de novo, reversing only if no reasonable jury could have found [Boykin] guilty." *United States v. Ruiz-Zarate*, 678 F.3d 683, 689 (8th Cir. 2012) (citation omitted). To sustain Boykin's marijuana-conspiracy conviction, "the government had to prove that (1) a conspiracy to distribute marijuana existed; (2) [Boykin] knew of the conspiracy; and (3) [Boykin] intentionally became a part of the conspiracy." *Id*. (citation omitted). The government often has to establish "the agreement and members' participation in the conspiracy . . . by way of inference" considering that "the nature of conspiracy entails secrecy." *Id*. (quotation and citation omitted). In the absence of direct evidence of a conspiracy, "the jury is free to consider all the evidence—direct and indirect—presented of the defendant's statements and actions[,] and [it] may draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented in the evidence." *Id*. at 689–90 (first alteration in original) (quotation and citation omitted).

-14-

Boykin "argues that the government proved only that he had a buyer-seller relationship with [R.W.], which by itself was insufficient to support the conspiracy conviction." *United States v. Peeler*, 779 F.3d 773, 776 (8th Cir. 2015). Boykin "is correct that proof of a buyer-seller relationship without more is not sufficient to prove a conspiracy." *United States v. Finch*, 16 F.3d 228, 231 (8th Cir. 1994) (citing *United States v. Prieskorn*, 658 F.2d 631, 633 (8th Cir. 1981)). "'Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction.'" *United States v. Huggans*, 650 F.3d 1210, 1222 (8th Cir. 2011) (quoting *Prieskorn*, 658 F.2d at 634). "The principle is well-established, at least in this circuit, but it is limited to a narrow category of cases. '[B]uyer-seller relationship cases involve only evidence of a *single transient sales agreement* and *small amounts of drugs* consistent with *personal use*.'" *Peeler*, 779 F.3d at 776 (alteration in original) (emphases added) (quoting *Huggans*, 650 F.3d at 1222). "[T]o reach such a conclusion there must be 'no independent evidence tending to prove that the defendant had some *knowledge* of the broader conspiracy.'" *United States v. Vinton*, 429 F.3d 811, 815 (8th Cir. 2005) (emphasis added) (quoting *Prieskorn*, 658 F.2d at 635).

By contrast, "evidence is sufficient to show a conspiracy where drugs are *purchased for resale*." *United States v. Conway*, 754 F.3d 580, 588 (8th Cir. 2014) (emphasis added) (citation omitted). "'Evidence of *multiple sales* of *resale quantities* of drugs is sufficient in and of itself to make a submissible case of a conspiracy to distribute.'" *Peeler*, 779 F.3d at 776 (emphases added) (quoting *Conway*, 754 F.3d at 588). "When evidence exists that *large amounts* of drugs were distributed over an *extended period of time*, including fronting transactions, there is ample evidence to support a conspiracy." *Conway*, 754 F.3d at 588 (emphases added) (citing *United States v. Slagg*, 651 F.3d 832, 841 (8th Cir. 2011)). "[A] reasonable jury can find that a defendant has more than a mere buyer-seller relationship 'if the evidence supports a finding that they *shared a conspiratorial purpose to advance other transfers*."

*Slagg*, 651 F.3d at 842 (alteration in original) (emphasis added) (quotations and citations omitted).

We have previously approved of the following description of "the buyer/seller defense as defined in our prior cases":

> that transient sales where a buyer is purchasing drugs for his *own personal use* and not for the purpose of distributing or delivering the purchased drugs to another does not, in and of itself, make the buyer a co-conspirator with the seller in the seller's drug distribution conspiracy. If, however, the buyer acquires the drugs from the seller intending to distribute or deliver the drugs to another person *instead of using them for his own personal use*, or if he purchased the drugs from the seller as part of the *continuing buyer/seller relationship*, he may be, *depending on what the evidence shows*, a co-conspirator with the seller in a drug distribution conspiracy.

*Peeler*, 779 F.3d at 775, 776 (emphases added).

This is not a case in which the government offered evidence of *multiple* drug transactions between Boykin and R.W. Instead, the government's evidence established no more than a "transient sales agreement" between Boykin and R.W. for R.W. to purchase a "small amount of drugs consistent with personal use." *See Peeler*, 779 F.3d at 776 (quotation and citations omitted). First, the government does not dispute that the first transaction in which R.W. purchased one gram of marijuana for $15 was for R.W.'s personal use and amounted to nothing more than a buyer-seller relationship. Second, R.W. did not purchase any marijuana from Boykin when Boykin approached him during the end of 2012. Finally, the government offered *no evidence* that R.W.'s attempted purchase of one ounce of marijuana in 2013 from Boykin constituted a resale quantity of marijuana as opposed to a personal-use amount. *Cf. United States v. Gay*, No. 2:10–CR–54, 2010 WL 3781555, at *2 (E.D. Tenn. Sept. 21, 2010) ("The real issue concerns the 14.6 grams of marijuana, which equates to

approximately one-half ounce. The case agent, who attended the hearing, candidly advised the court that one-half ounce of marijuana could be either for personal use or for distribution, that 'it could go either way.'"). Indeed, a review of case law reveals that one ounce of marijuana could be considered a personal-use amount of marijuana.[5]

R.W.'s subjective intention that he was going to "share" the marijuana with his teammates and that "they would either pay [R.W.] back or smoke back with [him]" is not proof that one ounce of marijuana is a resale quantity of marijuana. First, R.W. never testified that one ounce of marijuana is a resale quantity of marijuana; instead,

---

[5] *Compare United States v. Chauncey*, 420 F.3d 864, 869 (8th Cir. 2005) ("Fast Horse purchased approximately two ounces of marijuana for $240, apparently intending to keep one ounce for personal use and to sell the other ounce later that day in Winner, South Dakota, where Chauncey knew of a potential customer."), *and United States v. Emery*, 34 F.3d 911, 913 (9th Cir. 1994) ("Until recently, it was legal under Alaska law for persons over age eighteen to possess up to four ounces of marijuana for personal use."), *and United States v. Anderson*, 981 F.2d 1560, 1564 (10th Cir. 1992) ("No informant, undercover agent, or coconspirator testified regarding Mr. Anderson's involvement in the conspiracy. Mr. Anderson may well have been convicted of conspiracy because of his misfortune to conduct a one-time transaction at the Grogan residence on this particular day. The evidence only established Mr. Anderson's single delivery of six ounces of marijuana to Joe Cordova for personal use. This transaction does not show that Mr. Anderson knew of the essential objectives or the scope of the conspiracy, or that he knowingly and voluntarily became a part of it." (citation omitted)), *with United States v. McCollum*, 64 F. App'x 402, 402 (4th Cir. 2003) (per curiam) ("The bag contained approximately eleven ounces of marijuana, an amount typically kept not for personal use, but for redistribution."); *United States v. Duong*, Criminal No. 3:10–cr–9 (VLB), 2011 WL 24113521, at *4 (D. Conn. June 10, 2011) ("Duong was selling drugs out of the residence he shared with Elizabeth, and Elizabeth was present in 2002 when Duong was arrested with more than 9 ounces of marijuana in his vehicle, an amount exceeding that customarily possessed for personal use and which Duong admitted he intended to sell.").

he merely testified that, in his subjective opinion, it was "a lot of marijuana." Second, his testimony indicates that he was going to smoke some of the marijuana; therefore, some of it was for his personal use. Third, and most importantly, R.W. *never* disclosed his intention to Boykin to share the marijuana with others or receive money from others for the marijuana that he purchased from Boykin. *See Vinton*, 429 F.3d at 815; *Slagg*, 651 F.3d at 841.

Given the government's failure to offer any proof that Boykin sold R.W. a resale quantity of marijuana or that Boykin had knowledge of what R.W. planned to do with the marijuana, we hold that the government proved only that Boykin had a buyer-seller relationship with R.W., which is insufficient to support the conspiracy conviction.

But the government also contends that Boykin was in a conspiracy to distribute marijuana with "others," such as Patterson and Boykin's "source of supply." As to Patterson, the record is devoid of any evidence that Patterson and Boykin conspired to distribute marijuana. While Boykin inquired of Patterson on at least two occasions whether Patterson had any marijuana, Patterson did not have any marijuana on the occasions when Boykin asked. The government offered no evidence that Patterson was Boykin's "source of supply" or that Boykin ever purchased any drugs from Patterson.

As to Boykin's unknown "source of supply," we have recognized that "'[t]he fact that the identity of some or all other members of the conspiracy remains unknown will not preclude a conspiracy conviction.'" *United States v. Mann*, 701 F.3d 274, 296 (8th Cir. 2012) (quoting *United States v. Agofsky*, 20 F.3d 866, 870 (8th Cir. 1994)). But in the present case the government offered no evidence of Boykin acquiring marijuana from *any* source; instead, it simply points to the fact that Boykin was able to fill R.W.'s $15 order for marijuana.

Given the record evidence, we hold that the government failed to prove that Boykin was in a conspiracy to distribute marijuana with R.W., Patterson, or an unknown source of supply. Accordingly, we reverse his conviction on Count 1.[6]

### III. *Conclusion*

Accordingly, we affirm Boykin's kidnapping conviction but reverse his conviction on the conspiracy count. We remand for further proceedings consistent with this opinion.

BYE, Circuit Judge, dissenting in part.

The superseding indictment was missing an essential element of the kidnapping charge and Boykin's kidnapping conviction should be vacated. Therefore, I respectfully dissent from Part II.A. of the Court's opinion.

The Court relies on Hayes v. United States, 296 F.2d 657 (8th Cir. 1961), to hold the Fifth Amendment does not require an indictment to list a motive in kidnapping cases. In Hayes, the § 1201 indictment did not charge the defendant held victims for any specific reason and the Eighth Circuit determined the indictment was sufficient. The discussion of the motive element, however, was dicta. Before discussing the sufficiency of the indictment, the court found Hayes had waived the issue. Id. at 666.[7] Because the court determined the issue was waived before discussing the merits, any discussion was dicta. "[W]e need not follow dicta. Dicta

_____

[6]Because we reverse Boykin's conviction on Count 1, we need not address whether the district court erred in declining to give the requested buyer-seller instruction.

[7]I note Hayes' conclusion regarding the waiver is no longer good law. In United States v. Camp, 541 F.2d 737, 741 (8th Cir. 1976), the Eighth Circuit held a challenge to the sufficiency of the indictment, where it is alleged the indictment is missing an essential element of the offense, is permissible for the first time on appeal.

-19-

is a judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." Shephard v. United States, 735 F.3d 797, 798 (8th Cir. 2013). The dicta from Hayes has not been followed by the Eighth Circuit,[8] and I would not follow it now.

Even assuming Hayes created precedent, any such precedent is no longer valid because intervening Supreme Court cases have changed the law on kidnapping. See McCullough v. AEGON USA Inc., 585 F.3d 1082, 1085 (8th Cir. 2009) ("A limited exception to the prior panel rule permits us to revisit an opinion of a prior panel if an intervening Supreme Court decision is inconsistent with the prior opinion."). In Hayes, the Eighth Circuit found important that the Supreme Court had previously "laid no stress on the statutory words 'held for ransom or reward or otherwise'" in setting forth the essential elements of § 1201. Hayes, 296 F.2d at 667 (citing Smith v. United States, 360 U.S. 1, 9 (1959)). After Hayes was decided in 1961, the Supreme Court made clear motive *is* an essential element of kidnapping. United States v. Healy, 376 U.S. 75, 81 (1964) (holding motive for kidnapping conviction can be pecuniary or non-pecuniary). The Eighth Circuit has since repeatedly held motive is an essential element of kidnapping. United States v. Brown, 330 F.3d 1073, 1078 (8th Cir. 2003) (discussing whether government had adequately proven motive at trial); United States v. Bordeaux, 84 F.3d 1544, 1548 (8th Cir. 1996) (same); United States v. McCabe, 812 F.2d 1060, 1061 (8th Cir. 1987) (same). Motive is an essential element of a kidnapping conviction: if the government fails to prove motive a conviction cannot stand. "If an essential element is omitted from the indictment, then the defendant's Fifth Amendment right to be tried on charges found by a grand

---

[8]The discussion in Hayes about the sufficiency of the indictment has only been cited once by the Eighth Circuit. See Davidson v. United States, 312 F.2d 163, 165 (8th Cir. 1963). In Davidson, the indictment included the language "and held for ransom, reward and otherwise," id. at 163 n.2, and is thus inapplicable to the present case.

-20-

jury has been violated." United States v. O'Hagan, 139 F.3d 641, 651 (8th Cir. 1998). Boykin's Fifth Amendment right to indictment by a grand jury was violated.

I agree Boykin was sufficiently informed by the indictment of the charges against him to protect him from double jeopardy. However, the Fifth Amendment right to be tried upon charges found by a grand jury is separate from the requirement that an indictment provide notice of the offense and bar the defendant from double jeopardy. United States v. Camp, 541 F.2d 737, 739-40 (8th Cir. 1976) (citing Ex Parte Bain, 121 U.S. 1 (1887)). I cannot agree the indictment complied with Boykin's Fifth Amendment right to indictment by a grand jury because the grand jury did not "consider[] and f[i]nd all essential elements of the offense charged." O'Hagan, 139 F.3d at 651.

Accordingly, I would vacate Boykin's kidnapping conviction.

———————————————