# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2810
_____

United States of America

*Plaintiff - Appellee*

v.

Marcell Shavers

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: November 13, 2019
Filed: April 6, 2020
_____

Before SHEPHERD, GRASZ, and KOBES, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Following a jury trial, Marcell Shavers was found guilty of one count of conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846, and was acquitted of one count of using a firearm during a drug trafficking offense to commit murder, in violation of 18 U.S.C. §§ 2, 924(c), and 924(j)(1). He was sentenced to the statutory maximum of 480 months imprisonment. On appeal, Shavers challenges the sufficiency of the

evidence, the district court's[1] jury instructions, the admission of evidence showing that he was previously incarcerated, and his sentence. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On the morning of January 1, 2014, James Roberts and Ronald Wilson drove around together in a silver Hyundai Sonata selling drugs in Kansas City, Missouri.[2] In the early afternoon, they drove to Discount Smokes & Liquor. While there, Matthew Milton also entered the store. Roberts approached Milton, who had never met Roberts or Wilson prior to this encounter, and asked whether Milton had, or knew where Roberts could purchase, methamphetamine. Milton informed Roberts that he knew where to purchase it. The two exchanged phone numbers and left separately. After returning to the silver Hyundai, Roberts reported to Wilson that he found someone from whom he could purchase drugs.

Milton later called his friend Jose Medellin to arrange a sale of methamphetamine to Roberts. Medellin told Milton to meet him later that day at Medellin's apartment building to complete the deal. Milton then called Roberts to inquire how much methamphetamine Roberts would like to purchase and to negotiate a price. Roberts initially requested one ounce, and the parties discussed a sale price of $800 to $1,000. Roberts later inquired whether he could purchase two ounces instead of one ounce, and they agreed to meet that evening at Discount Smokes & Liquor.

---

[1]The Honorable Greg Kays, United States District Judge for the Western District of Missouri.

[2]We recount the relevant testimony and other evidence presented at trial in the light most favorable to the jury's verdict. See United States v. Washington, 318 F.3d 845, 850 (8th Cir. 2003).

Later that evening, Wilson drove the silver Hyundai to his mother's house to pick up the defendant, Marcell Shavers, who was living with Wilson's mother at the time. Shavers was also acquainted with Roberts, as the two had spent just under 17 months together in a Missouri state prison, and Roberts had helped Shavers while the two were incarcerated. Before leaving the residence, Shavers told Wilson's mother that Roberts was "blowing up his phone" and that he was leaving to meet Roberts. Shavers, who was armed with a handgun, left with Wilson. Wilson and Shavers then picked up Roberts. At some point, Roberts asked Wilson to drive him back to Discount Smokes & Liquor so Roberts could "holler at the dude from earlier." Wilson interpreted this to mean that Roberts had set up a drug deal, and, at approximately seven in the evening, Wilson drove back to Discount Smokes & Liquor and dropped off Roberts.

Milton met Roberts at the liquor store and told Roberts that they would go together to the Sterling Court apartments, where Medellin lived, to finish the deal. After meeting Milton, Roberts told Wilson and Shavers to follow him as he purchased drugs that evening and to provide him with "backup" at the deal. Roberts accompanied Milton in Milton's vehicle, and Wilson and Shavers followed them in Wilson's silver Hyundai. On the way to the apartment building, Milton and Roberts stopped at a gas station so that Milton could purchase gas. As Milton finished paying for gas, he observed Roberts walking away from a silver Hyundai. Milton and Roberts continued towards the apartment building. Milton pulled into the parking lot of a QuikTrip convenience store adjacent to the apartment building and told Roberts he was going to walk to the apartment building to get the drugs and bring them back to Roberts. Roberts, however, insisted that the two continue to drive to Medellin's apartment building and complete the deal there.

In the meantime, Wilson and Shavers also arrived at the QuikTrip in Wilson's silver Hyundai while Milton and Roberts were still there. At some point that evening, Roberts had told Wilson to leave Shavers at the QuikTrip. Shavers exited the vehicle,

still carrying the handgun, while Wilson left the QuikTrip and returned to his home. Wilson understood that he was leaving Shavers to serve as Roberts's "backup."

Milton and Roberts arrived at Medellin's apartment building and initially parked to the side of the building. Milton went into the front entrance of the building, where he encountered Medellin and told Medellin that he had a buyer for the methamphetamine. Medellin asked Milton to wait while he went upstairs. Milton returned to his vehicle and pulled around to the back of the apartment building. A man wearing an olive green coat and a scarf covering his face approached Milton and Roberts and said something to Roberts. Milton and Roberts told this man to leave, and the man complied. Medellin subsequently appeared at the rear door of the apartment building. Milton instructed Roberts to give him the money for the methamphetamine, but Roberts refused. Milton then went inside and asked Medellin to give him the methamphetamine to give to Roberts, but Medellin refused. Roberts went inside to talk to Medellin.

Once inside, Roberts, Milton, and Medellin went into the nearby laundry room to discuss the deal. Milton brought scales, which he placed on a dryer, and Medellin produced the methamphetamine. Roberts pulled out some money, but initially hesitated and asked about the quality of the methamphetamine that he was about to purchase. Medellin offered to let Roberts sample it and pulled out a glass smoking pipe, but Roberts declined the offer and told Medellin, "No, I don't smoke." Roberts then exited the building to urinate. While Roberts was outside, Medellin and Milton weighed two bags of methamphetamine, and Medellin instructed Milton to sell Roberts the lighter of the two bags, if Roberts would only purchase one, at a price of $1,000.

After Roberts returned to the door of the building, Milton let Roberts back inside, and the two returned to the laundry room to continue negotiating. Milton's vehicle alarm then started sounding, and he left the building to investigate. As Milton

walked outside, he noticed the man wearing an olive green coat and a scarf over his face walk into the building. After checking on his vehicle, Milton returned to the back door of the building, which was locked. Inside, he saw Medellin with his hands in the air and the man wearing the olive green coat pointing a handgun at Medellin. Roberts was searching Medellin's pockets. Milton banged on the door and demanded to be let inside. Roberts backed away from Medellin, and the man wearing the olive green coat shot Medellin twice. Medellin fell to the floor. Milton fled, and after briefly being pursued by Roberts and the man wearing the olive green coat, he escaped to the QuikTrip, where a clerk alerted the police.

Roberts subsequently called Wilson and told him to drive to a nearby IHOP restaurant to pick up him and Shavers. When Roberts and Shavers entered the car, Roberts said "Celly did something stupid, Celly did something stupid." Shavers later told Wilson that he was with Medellin, Milton, and Roberts in the apartment building and that he shot Medellin after he observed Medellin reaching into his pocket for a gun. After Wilson dropped off Roberts at home, Wilson asked Shavers what happened to the handgun. Shavers responded that he dropped it when he hopped a fence near the IHOP. Although Shavers wanted to recover the weapon, Wilson drove Shavers back to Wilson's mother's residence.

Police and paramedics were dispatched to Medellin's apartment building. Paramedics confirmed Medellin had died at the scene—three bullets caused seven wounds, resulting in Medellin's death. The police recovered seven shell casings around the laundry area and two baggies containing 55.3683 grams of 80 percent pure methamphetamine from Medellin's pockets. They also found a glass pipe with methamphetamine and amphetamine residue in Medellin's hand.

The following day, Shavers told Wilson's mother that "it all went bad" and that "We didn't get no money. We didn't get no drugs . . . it just all went bad, Ms. Jackson . . . I should have listened to you and not went with him." Moreover, he

mentioned to Wilson's sister that he and Roberts went on a "mission" to rob a "Mexican guy," but that his mission failed and that he had to shoot an individual after observing the man pull out a weapon. Shavers later left Kansas City for Detroit.

Investigators later recovered a handgun on a hill near the IHOP that was close to Medellin's apartment building. The bullets and cartridges found at the murder scene were determined to have been fired from that handgun. Moreover, DNA found on the weapon matched that of Shavers and excluded Milton, Roberts, and Wilson as contributors.

Shavers and Roberts were subsequently charged by superseding indictment with one count of conspiracy to possess methamphetamine with intent to distribute and one count of using a firearm during a drug trafficking offense to commit murder. Roberts pled guilty to the drug conspiracy charge and was sentenced to 282 months imprisonment. Following a jury trial, Shavers was convicted on the drug conspiracy charge and acquitted of the firearm charge. The district court sentenced him to 480 months imprisonment. This appeal follows.

II.

Shavers argues that the district court erred by denying his motions for judgment of acquittal and for a new trial. He asserts that there was insufficient evidence to prove a conspiracy to possess with intent to distribute methamphetamine. First, he argues that the evidence at trial showed only a "buyer-seller" relationship between Milton and Roberts and contends that this is insufficient to prove that any conspiracy existed between Roberts and any other person, including Shavers. Second, he argues that the government failed to present evidence showing that Shavers knew that the drug transaction in question involved methamphetamine. Third, he suggests that the government failed to prove anything beyond Shavers's "mere presence" at the scene of the failed drug transaction.

"[W]e will review the sufficiency of the evidence to sustain a conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and reversing the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Ramos, 852 F.3d 747, 753 (8th Cir. 2017) (internal quotation marks omitted). We review the district court's denial of a motion for a new trial for an abuse of discretion, United States v. Slagg, 651 F.3d 832, 839 (8th Cir. 2011), and will reverse only if "the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." United States v. Espinosa, 300 F.3d 981, 983 (8th Cir. 2002) (quoting United States v. Lacey, 219 F.3d 779, 783 (8th Cir. 2000)).

In order to prove that Shavers conspired to possess methamphetamine with intent to distribute, the government needed to show that: (1) there was an agreement between Shavers and Roberts to possess drugs with the intent to distribute, (2) Shavers knew of the conspiracy, and (3) Shavers intentionally joined in the conspiracy. See United States v. Davis, 826 F.3d 1078, 1081 (8th Cir. 2016). Because count one charged that Shavers conspired with Roberts, and not any other person, the government needed to prove a conspiracy between those two. So long as it found beyond a reasonable doubt that Shavers and Roberts were both participants in the conspiracy, a jury could convict Shavers of count one even if there was evidence suggesting that there were also other participants in that conspiracy.

Further, "a defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc). Because conspiracies are often secretive, their existence may be proven through circumstantial evidence alone, United States v. Mann, 701 F.3d 274, 296 (8th Cir. 2012), and evidence of an agreement to join the conspiracy may be inferred from the facts. See Lopez, 443 F.3d at 1030-31. However, mere presence at a drug transaction, even if the defendant knows that someone else intends to buy

and sell drugs, is insufficient to establish that the defendant is a part of a drug conspiracy.  See United States v. Jimenez-Villasenor, 270 F.3d 554, 558 (8th Cir. 2001).

It is clear from the trial record that there was sufficient evidence showing that Roberts sought to possess methamphetamine with intent to distribute.  The jury heard evidence that Roberts was distributing drugs earlier that day.  See United States v. Turpin, 920 F.2d 1377, 1383 (8th Cir. 1990) (noting that past distribution of drugs can support finding of intent to distribute drugs).  It heard evidence showing that Roberts approached Milton and asked if Milton had methamphetamine, or knew where Roberts could purchase it.  The evidence also showed that Roberts reported to Wilson that he found someone from whom he could purchase drugs, and Roberts arranged to buy a very large amount—at least one ounce—of methamphetamine from Milton's friend Medellin.  Medellin also brought 55.3683 grams—just under two ounces—of 80 percent pure methamphetamine to the scene of the failed deal.  See United States v. Schubel, 912 F.2d 952, 956 (8th Cir. 1990) ("Intent to distribute may be inferred solely from the possession of large quantities of narcotics."); cf. United States v. Fang, 844 F.3d 775, 779 (8th Cir. 2016) (holding that 25 grams of methamphetamine, with $3,900 in cash and small plastic bags, supports an inference of intent to distribute).  Moreover, evidence was presented at trial that Roberts did not smoke methamphetamine, which further supported the conclusion that he was attempting to purchase the drug for resale.  Finally, the transaction itself occurred in the presence of cash, firearms, and a scale—the presence of such items are indicia of drug trafficking and support a finding of intent to distribute.  Schubel, 912 F.2d at 956 ("The presence of equipment to weigh and measure the narcotics, paraphernalia used to aid in their distribution, and large sums of cash are common indicia of drug trafficking and are all circumstantial evidence of intent to distribute.").  For these reasons, we conclude there was ample evidence from which a reasonable jury could find that Roberts sought to possess the methamphetamine with the intent to distribute.

There was also sufficient evidence from which a reasonable jury could find that Shavers knew of, agreed to, and intended to participate in Roberts's plan to possess methamphetamine with intent to distribute. The jury heard testimony that Roberts contacted Shavers repeatedly via cell phone on the day in question and that, at some point in the evening, Roberts asked Shavers to accompany him to the scene of the drug transaction in order to provide "backup." There was also testimony presented at trial showing that Roberts and Shavers were acquainted with one another while they were in prison, and the jury could reasonably infer from their personal relationship that Shavers had a motive to help Roberts complete the drug deal in order to repay Roberts for helping Shavers while the two were incarcerated. Further, when Wilson picked up Shavers, Shavers was carrying the handgun that was later used to kill Medellin. The jury also heard evidence that Shavers later told Wilson's mother that (1) the deal "went bad," (2) Roberts and Shavers didn't obtain any drugs or money, and (3) Shavers regretted accompanying Roberts.

Shavers argues that the evidence at trial merely shows a small drug transaction between a buyer, Roberts, and a seller, Milton, which does not support a finding of a broader conspiracy. See, e.g., United States v. Boykin, 794 F.3d 939, 948 (8th Cir. 2015) ("Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction." (quoting United States v. Huggans, 650 F.3d 1210, 1222 (8th Cir. 2011)). But as discussed above, there was substantial evidence that Roberts sought to possess methamphetamine with intent to distribute and that Shavers actively joined him in that endeavor, regardless of whether Milton or Medellin, the putative sellers, or Wilson, were also a part of that conspiracy. Moreover, the evidence is also inconsistent with the argument that Roberts and Milton had a mere "buyer-seller" relationship, given the large quantity of methamphetamine at issue and other evidence of Roberts's intent to further distribute the drug. Cf. Boykin, 794 F.3d at 948 (noting that the "[b]uyer-seller relationship cases involve only evidence of a single transient

sales agreement and small amounts of drugs consistent with personal use" (emphasis omitted) (internal quotation marks omitted)).  Finally, that the government failed to present direct evidence of distribution of methamphetamine by Roberts is of no moment—again, the jury could reasonably infer Roberts's intent to distribute from, among other things, the quantity involved, his prior conduct, and the fact that Roberts did not personally smoke methamphetamine.  See, e.g., Schubel, 912 F.2d at 956; Turpin, 920 F.2d at 1383.

Shavers also argues the government failed to prove he had knowledge of the type of drug involved in the sale or that the quantity involved was of distribution weight.  However, in light of the substantial circumstantial evidence of Shavers's intent to participate in the conspiracy, we are unpersuaded.  The jury heard evidence that Roberts was "blowing up" Shavers's phone and that Roberts asked Shavers to serve as backup at the deal.  It would be reasonable for a jury to infer from these facts that Roberts informed Shavers about the nature of the deal, including the type of drug and general quantity to be purchased.  Additionally, Shavers made an appearance as the drug transaction was underway and thus potentially in a position to see the type of drug and quantity involved.

Shavers further argues that, at most, the evidence shows that he was merely present at the drug deal.  See Jimenez-Villasenor, 270 F.3d at 558 (mere presence at a drug deal is insufficient to establish that defendant intended to join the conspiracy).  Contrary to his argument, a reasonable jury could find from the evidence that Shavers was an active participant in the deal between Roberts, Milton, and Medellin.  Again, as discussed above, the jury heard, among other things, that Shavers and Roberts had a personal relationship, Roberts repeatedly contacted Shavers on the day in question, Shavers went to act as "backup" at the deal, and Shavers reported the failure of the deal to Wilson's mother.

Accordingly, there is enough evidence to sustain Shavers's conviction on the conspiracy charge. We see no error in the district court's decision to deny his motions for a judgment of acquittal and for a new trial.

## III.

Shavers next challenges the district court's jury instructions in two respects. First, he argues that the district court's jury instructions constructively amended, or fatally varied from, count one of the superseding indictment. Second, he argues that the district court erred by failing to give his proposed theory-of-the-defense instructions, namely, a "buyer-seller" instruction and a "mere presence" instruction.

## A.

First, we consider whether the district court's jury instructions constructively amended, or varied from, count one of the superseding indictment. It is unclear what standard of review we apply to such claims. Some panels of this Court have applied an abuse of discretion standard, e.g., United States v. Lasley, 917 F.3d 661, 664 (8th Cir. 2019) (per curiam), while others have applied de novo review, e.g., United States v. Stuckey, 220 F.3d 976, 979 (8th Cir. 2000). Although the earlier-filed opinion generally controls in the event of an actual intra-circuit conflict, see Jones v. Aetna Life Ins. Co., 856 F.3d 541, 546 (8th Cir. 2017), we need not resolve the issue because "[l]ittle turns . . . on whether we label the review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction." Avon State Bank v. BancInsure, Inc., 787 F.3d 952, 959 n.3 (8th Cir. 2015) (quoting Henley v. Brown, 686 F.3d 634, 639 (8th Cir. 2012)).

"A constructive amendment occurs when the essential elements of the offense as charged in the indictment are altered in such a manner . . . that the jury is allowed

-11-

to convict the defendant of an offense different from or in addition to the offenses charged in the indictment." United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007). This often occurs "through the evidence presented at trial or the jury instructions." Id. A constructive amendment to an indictment implicates a defendant's grand jury right under the Fifth Amendment.[3] United States v. Jarrett, 684 F.3d 800, 802 (8th Cir. 2012). "In order to determine whether an indictment was constructively amended, we consider whether the jury instructions, taken as a whole, created a substantial likelihood that the defendant was convicted of an uncharged offense." United States v. Buchanan, 574 F.3d 554, 564 (8th Cir. 2009) (internal quotation marks omitted).

"A variance arises when the evidence presented proves facts that are materially different from those alleged in the indictment." Id. (internal quotation marks omitted). A variance implicates the defendant's Sixth Amendment right to adequate notice and is subject to harmless error review. United States v. Harris, 344 F.3d 803, 805 (8th Cir. 2003) (per curiam). "The basic difference between a constructive amendment and a variance is this: a constructive amendment changes the charge, while the evidence remains the same; a variance changes the evidence, while the charge remains the same." Stuckey, 220 F.3d at 981.

Count One of the superseding indictment charges that "the defendants, JAMES P. ROBERTS and MARCELL SHAVERS, did knowingly and intentionally combine, conspire, confederate and agree together and with each other" to possess

---

[3]Although some panels of this Court have held that a constructive amendment to an indictment constitutes per se reversible error, "at least one panel has observed that the per se rule exists only in repeated dicta and may be inconsistent with Supreme Court precedent." United States v. Lasley, 917 F.3d 661, 664 n.1 (8th Cir. 2019) (per curiam). In any event, we need not decide whether a constructive amendment to an indictment constitutes per se reversible error because, for the reasons given below, we find that no such amendment occurred in this case.

methamphetamine with the intent to distribute. In Jury Instruction No. 19, the district court instructed the jury that the first element of the conspiracy charge is that "on or before January 1, 2014, two or more persons reached an agreement or came to an understanding to possess with intent to distribute methamphetamine." Shavers contends that, by using "two or more persons" rather than naming "James P. Roberts and Marcell Shavers," the jury instructions constructively amended or fatally varied from the indictment in this case.

We are not persuaded that any constructive amendment occurred on account of Jury Instruction No. 19. Taken as a whole, the jury instructions focused on the two co-conspirators alleged in the indictment: Roberts and Shavers. Jury Instruction No. 2 stated that "Count One of the Indictment alleges that on or about January 1, 2014, in the Western District of Missouri, defendant Marcell Shavers knowingly and intentionally conspired with James Roberts to commit the crime of possessing with intent to distribute five (5) grams or more of methamphetamine." Moreover, the jury was further instructed that Shavers "is on trial only for the crimes charged, not for anything else." In light of these instructions, we do not think that there was a substantial likelihood that Shavers was found guilty of an uncharged offense simply because Jury Instruction No. 19 did not specifically identify Shavers and Roberts—the remainder of the instructions sufficiently focused on them as the alleged co-conspirators. See United States v. Morton, 412 F.3d 901, 906 (8th Cir. 2005) (rejecting similar argument in light of the arguments presented at trial and another instruction given by the district court); see also United States v. Leahy, 82 F.3d 624, 630-31 (5th Cir. 1996).

Although Shavers relies heavily on United States v. Yeo, 739 F.2d 385 (8th Cir. 1984) in support of his argument, we think Yeo is distinguishable on the facts. In Yeo, the indictment alleged that the defendant used "extortionate means to collect and attempt to collect [a debt] from Jim Crouch," but the jury instructions would have permitted the jury to find the defendant guilty if he used "extortionate means to

collect or attempt to collect from Jim Crouch *or another*." 739 F.2d at 386. Thus, the instructions in <u>Yeo</u> would have allowed the jury to convict the defendant even if it found that the defendant used extortionate means to collect a debt from someone other than Crouch, despite the fact that the defendant was indicted only for his use of extortionate means to collect a debt from Crouch. <u>See id.</u> at 387. But in this case, the jury instructions, when taken as a whole, did not permit the jury to find that Shavers conspired with someone other than Roberts—as further explained below, they would permit a jury to find, at most, that Shavers conspired with Roberts *and* another person.

Similarly, we find that no fatal variance occurred. Even if the jury found that Shavers also conspired with someone other than Roberts—Wilson, Milton, or Medellin—based on the evidence presented at trial, the instructions required the jury to find that Shavers also conspired with Roberts. Indeed, Roberts was the central player in this conspiracy: he set up the purchase through Milton, he asked Wilson to drive to and later follow him to some of the locations before the deal, and he personally instructed Shavers to accompany him. Roberts was the one "blowing up" Shavers's phone earlier that day and needed Shavers to serve as his "backup" at the deal. After the deal soured, Roberts was the one who called Wilson to pick him and Shavers up. Roberts was very clearly the "hub" of this conspiracy, while Shavers was merely a "spoke"—even if there were also other co-conspirator "spokes," they were all connected to one another through Roberts. <u>See</u> <u>United States v. Slaughter</u>, 128 F.3d 623, 630 (8th Cir. 1997) (discussing "hub" and "spoke" conspiracies). Thus, Shavers necessarily conspired with Roberts, even if Shavers also conspired or acted in concert with any other person. This conclusion is also supported by the fact that the government principally argued at trial that Shavers conspired with Roberts, his indicted co-conspirator. <u>See</u> <u>United States v. Adams</u>, 604 F.3d 596, 600 (8th Cir. 2010) ("We conclude no variance occurred either, particularly because the government never wavered in its theory of the case at trial[.]"). Accordingly, we reject Shavers's variance argument.

B.

Next, we consider Shavers's challenge to the district court's failure to give his proposed "buyer-seller" and "mere presence" instructions. "We review the rejection of a defendant's proposed instruction for abuse of discretion." United States v. Meads, 479 F.3d 598, 601 (8th Cir. 2007).

We have explained that "[a] defendant is entitled to a theory of defense instruction that is timely requested, supported by the evidence, and correctly states the law. However, a defendant is not entitled to a particularly worded instruction." Id. (internal citations and quotation marks omitted). "The district court has broad discretion in formulating the jury instructions." United States v. Johnson, 278 F.3d 749, 751 (8th Cir. 2002). A district court does not abuse its discretion if it denies the defendant's specific instruction but gives an instruction that adequately and correctly covers the substance of the requested instruction. Meads, 479 F.3d at 601.

Shavers proposed the following buyer-seller instruction:

> A conspiracy requires more than just a buyer-seller relationship between a defendant and another person. In addition, a buyer and seller of methamphetamine do not enter into a conspiracy to possess methamphetamine with intent to distribute simply because the buyer resells the methamphetamine to others, even if the seller knows that the buyer intends to resell the methamphetamine.
>
> To establish that a buyer knowingly became a member of a conspiracy with a seller to possess methamphetamine with intent to distribute, the government must prove that the buyer and seller had a joint criminal objective of distributing methamphetamine to others.

-15-

The district court declined to give this instruction, though it did not give a clear reason for its refusal to do so. Nonetheless, "[w]e may affirm a judgment on any ground supported by the record even if not relied upon by the district court." Lane v. Peterson, 899 F.2d 737, 742 (8th Cir. 1990). Here, Shavers's proposed buyer-seller instruction does not correctly state the law in this circuit and the district court did not abuse its discretion in declining to give it.

We have emphasized that buyer-seller theories are "limited to a narrow category of cases. [B]uyer-seller relationship cases involve only evidence of a *single transient sales agreement* and *small amounts of drugs* consistent with *personal use*." Boykin, 794 F.3d at 948 (alteration in original) (internal quotation marks omitted). But when the evidence shows that drugs are purchased for resale, we have held that the buyer-seller relationship does not apply and that such evidence supports a finding of a conspiracy. Id. at 949 ("By contrast, evidence is sufficient to show a conspiracy where drugs are purchased for resale." (emphasis omitted) (internal quotation marks omitted)). Shavers's proposed instruction, which is patterned from a Seventh Circuit model instruction, goes far beyond our precedent in Boykin because it permits the jury to find a buyer-seller relationship even if the evidence suggests that the drugs were purchased for resale. Cf. id.; see also United States v. Davis, 867 F.3d 1021, 1033-34 (8th Cir. 2017) (affirming district court's refusal to give a similar buyer-seller instruction).

Further, the government argued that Roberts conspired with Shavers to possess methamphetamine with the intent to distribute, and a buyer-seller instruction would not bear on their agreement. Whether Roberts also conspired with Milton or Medellin, or merely had a buyer-seller relationship with them, does not necessarily mean that there was no conspiracy between him and Shavers. Additionally, for the reasons discussed in Section II, the evidence simply did not support giving the instruction. Again, Roberts was attempting to purchase a distribution-level quantity of methamphetamine, there was evidence that he did not personally smoke it, and he

-16-

had sold drugs earlier in the day. This proof, together with the fact that the deal occurred in the presence of a firearm and scales, is inconsistent with a purchase of a small quantity for personal use. See United States v. Conway, 754 F.3d 580, 591-92 (8th Cir. 2014).

Shavers also proposed the following "mere presence" instruction: "A defendant's mere presence at the scene and knowledge that another is going to engage in a drug transaction is not sufficient to support a finding of guilt beyond a reasonable doubt that the defendant entered into a conspiracy to possess with intent to distribute a controlled substance." The district court, however, gave an instruction containing the following language:

> Evidence that a person was present at the scene of an event, or acted in the same way as others or associated with others, does not, alone, prove that the person joined a conspiracy . . . A person's mere knowledge of the existence of a conspiracy, or mere knowledge that an objective of a conspiracy was being considered or attempted, or mere approval of the purpose of a conspiracy, is not enough to prove that the person joined in a conspiracy.

The instruction given by the district court adequately and correctly covered the substance of Shavers's proposed "mere presence" instruction. See United States v. Solis, 915 F.3d 1172, 1178 (8th Cir. 2019) (affirming the district court's rejection of a "mere presence" instruction where it gave a similar instruction to the one given by the district court in this case); see also United States v. Vore, 743 F.3d 1175, 1182 (8th Cir. 2014). Accordingly, we find no abuse of discretion in the district court's decision to refuse Shavers's proposed instruction.[4]

---

[4]Shavers also argues that the district court improperly allowed the government to decide whether this instruction should be given. We reject this argument, as it appears that the district court suggested it would give Shavers's proposed instruction

# IV.

Shavers also argues that the district court erred by permitting the government to elicit testimony showing that Shavers and Roberts knew one another when they were incarcerated in state prison and that Roberts had "helped" Shavers while the two were in prison.[5]  We review the district court's decision to admit such evidence for an abuse of discretion.  United States v. Nguyen, 608 F.3d 368, 376 (8th Cir. 2010).

Shavers asserts that evidence of a prior criminal conviction is admissible for impeachment purposes under Rule 609 only when the defendant testifies and the probative value of the evidence outweighs any prejudicial effect.  See Fed. R. Evid. 609(a)(1)(B).  Because Shavers did not testify, he contends that the district court erroneously admitted the evidence of his prior imprisonment.  He does not, however, appear to challenge the admission of this evidence under Rule 403 or Rule 404.

Shavers's Rule 609 argument is unconvincing.  The evidence of Shavers's and Roberts's acquaintance in state prison was not offered to impeach Shavers, as he did not testify at trial.  Rather, it was offered to show Shavers's prior relationship with Roberts and to explain why Shavers would join the conspiracy.  Because this evidence was relevant and admissible for "the purpose of providing the context in which the charged crime occurred" and to demonstrate Shavers's motive for participating, the district court did not abuse its discretion in admitting this testimony.  United States v. Young, 753 F.3d 757, 770 (8th Cir. 2014) (quoting United States v. Johnson, 463 F.3d 803, 808 (8th Cir. 2006)).

---

if the government did not object; however, the court noted that it believed the instruction was duplicative and that it was otherwise inclined not to give it to the jury.

[5]Specifically, a witness testified that Roberts "helped [Shavers] out in [prison] so [Shavers] wanted to be there for [Roberts]."

Finally, Shavers appeals his sentence. Specifically, he argues that the district court erred in applying the murder cross-reference located in USSG § 2D1.1(d)(1). He asserts that this was procedural error and that it resulted in a substantively unreasonable sentence. We review de novo the district court's interpretation and application of the United States Sentencing Guidelines, and we review its underlying factual findings for clear error. United States v. Jackson, 782 F.3d 1006, 1013 (8th Cir. 2015).

USSG § 2D1.1 establishes the base offense level for conspiracy to possess with intent to distribute methamphetamine and various specific offense characteristics that increase or decrease the base offense level. Id. USSG § 2D1.1(d)(1) instructs the district court to apply the base offense level under § 2A1.1 (first-degree murder) or § 2A1.2 (second-degree murder) if a victim was killed during the commission of the underlying drug conspiracy "under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States."

In applying the § 2D1.1(d)(1) cross reference, the district court explicitly found, by a preponderance of the evidence, that Shavers killed Medellin during the commission of the offense. It noted that:

> Based on the evidence I heard, you and your co-defendant went to go buy dope, and I note that the jury wasn't satisfied that you were guilty beyond a reasonable doubt, but I believe clearly by the preponderance of the evidence you were the shooter in this case, and you caused the death of Mr. Medellin. I believe that was very clear, at least greater than the preponderance of the evidence.

Accordingly, the district court applied a base offense level of 38, instead of 26, which resulted in a sentencing range of 360 months imprisonment to life imprisonment. Because the statutory maximum for the offense of conviction is 480 months imprisonment, Shavers's range was effectively 360 months to 480 months imprisonment.

First, Shavers contends that the application of § 2D1.1(d)(1) was erroneous because this case does not involve "circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States." Specifically, he asserts that this phrase means that the cross reference applies only to murders that are committed outside of the "jurisdictional reach" of the United States. Because Medellin's murder occurred in Kansas City, Missouri, Shavers asserts it was within the jurisdictional reach of the United States. He argues that the application of the murder cross reference was improper, and that the district court should have used a base offense level of 26, resulting in a range of 120 months to 150 months imprisonment.

Shavers's argument fails both as a factual and legal matter. Even assuming that his reading of the statute is correct, Medellin's murder occurred outside of the "territorial or maritime jurisdiction of the United States." Indeed, this phrase refers to particular places under the exclusive or concurrent territorial jurisdiction of the federal government, including certain statutorily defined places, Native American reservations, the high seas, and certain vessels and aircraft. See 18 U.S.C. § 7; United States v. Smith, 925 F.3d 410, 415-18 (9th Cir. 2019) (noting that 18 U.S.C. § 7 applies to reservations); see also United States v. Parker, 622 F.2d 298, 301-02 (8th Cir. 1980). This, however, does not include the apartment building where Medellin was murdered in Kansas City, Missouri. The government even concedes in its brief that it could not prosecute him for murder under 18 U.S.C. § 1111 because federal jurisdiction would be lacking.

Moreover, we have previously rejected this argument as a matter of law. See United States v. Weasel Bear, 356 F.3d 839, 841 (8th Cir. 2004) (rejecting same argument to identical language found in USSG § 2B3.1(c)(1)). The phrase "under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States" simply "requires a sentencing court to consider the full context of the defendant's offense and to account for any killing in the course of [the offense], regardless of the situs of the killing." Id.

Second, Shavers argues that the application of the murder cross reference was inappropriate because the killing was not relevant conduct to the count of conviction. He asserts that, based on the evidence presented at trial, Shavers could not have reasonably foreseen "the killing of Medellin by someone who is still unidentified." However, there was ample evidence presented at trial supporting the district court's finding, by the preponderance of the evidence, that Shavers was the one who killed Medellin during the course of, and in furtherance of, a drug deal, even if the jury acquitted Shavers on the firearm charge. See United States v. Watts, 519 U.S. 148, 157 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."); see also United States v. Gamez, 301 F.3d 1138, 1147 (9th Cir. 2002). Accordingly, we think that the district court correctly found that the murder of Medellin was relevant conduct.

Third, we reject Shavers's argument that, due to the district court's improper use of the cross reference, his sentence is substantively unreasonable. Because we find that the district court did not commit a procedural error with respect to applying the cross reference, Shavers's substantive reasonableness challenge must fall.

Accordingly, we find no error in Shavers's sentence.

## VI.

For these reasons, we affirm the judgment of the district court.

_____